IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
December 2011 Session

## CHRISTOPHER A. DAVIS v. STATE OF TENNESSEE

**Criminal Court for Davidson County**
**No. 96-B-866   J. Randall Wyatt, Jr., Judge**

_____

**No. M2010-01045-CCA-R3-PD - filed August 24, 2012**

_____

The Davidson County Criminal Court denied the Petitioner, Christopher A. Davis, post-conviction relief from his convictions on two counts of first degree murder, two counts of especially aggravated kidnapping, and two counts of especially aggravated robbery, but granted relief from his sentence of death and ordered a new capital sentencing hearing. The Petitioner appeals the denial of a new trial and the State appeals the granting of a new sentencing hearing. Having discerned no error, we affirm the order of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Matthew J. Sweeney, Gary C. Shockley and John S. Hicks, Nashville, Tennessee, for the Petitioner, Christopher A. Davis

Robert E. Cooper, Jr., Attorney General and Reporter, and Rachel West Harmon, Assistant Attorney General; Victor S. Johnson, III, District Attorney General and Thomas B. Thurman and Katrin N. Miller, Assistant District Attorneys General, for the Respondent, State of Tennessee

## OPINION

### Background

The Petitioner was convicted in 2000 of two counts of first degree murder, two counts of especially aggravated kidnapping, and two counts of especially aggravated robbery. The convictions relate to the 1996 murders of 18-year-old Gregory Ewing and 19-year-old DeAngelo Lee. The Petitioner received death sentences for the murders and an effective

fifty-year sentence for the other convictions. The Petitioner's co-defendant, Gdongalay P. Berry, was tried separately and received the same punishment. The jury sentenced the Petitioner to death based upon its finding of three aggravating circumstances: (1) the Petitioner was previously convicted of one or more felonies whose statutory elements involve the use of violence to the person; (2) the murders were committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the Petitioner; and (3) the murders were knowingly committed, solicited, directed, or aided by the Petitioner while he had a substantial role in committing or attempting to commit a robbery or kidnapping. See Tenn. Code Ann. § 39–13–204(i)(2), (6) and (7) (2003). The facts of this case were summarized by the supreme court in its opinion on direct appeal:

*Guilt Phase*

On the early morning of February 28, 1996, the bodies of the victims, Gregory Ewing and D'Angelo Lee, were discovered in a remote part of a construction site in the Berry Hill area of Nashville, Tennessee. Ewing had been shot seven times, including three gunshot wounds to his head. Lee had been shot five times, including three gunshot wounds to his head.

As a result of an investigation, the defendant, Christopher A. Davis, was charged with two counts of premeditated first degree murder, two counts of felony murder, two counts of especially aggravated robbery, and two counts of especially aggravated kidnapping. The evidence at the trial was as follows:

Antonio Cartwright, age 14, testified that on February 27, 1996, he was smoking marijuana in an apartment located on Herman Street in Nashville with the defendant, Christopher Davis, Yakou "Kay" Murphy, Gdongalay Berry, and an individual nicknamed "Sneak." Davis told Cartwright that there was going to be a "highjacking ... and a gun deal" that evening involving D'Angelo Lee and Gregory Ewing. Davis told the others that he wanted Lee's car and planned to "draw down on him." Davis told Cartwright that they would have to kill Lee and Ewing because the two victims knew where they lived.

Cartwright testified that when Davis, Berry, Murphy, and Sneak left the apartment on foot that evening, Davis was carrying a nine millimeter handgun and Berry was armed with a .45 caliber handgun. [Footnote: Harold Kirby testified that he had loaned Davis a nine millimeter handgun on the day before Davis was arrested for the murders of Ewing and Lee.] Davis and Berry returned in approximately one hour in a white Cadillac with four or five assault rifles, a pair of green tennis shoes with yellow laces, a black and blue jacket,

2

an additional .45 caliber handgun, and a gold cross necklace. Davis told Cartwright that he had killed the two victims and that he had shot Lee nine times in the head. Davis said the bodies had been dumped where they could not be found. Berry said that they needed to burn the Cadillac.

Christopher Loyal testified that he saw Davis and Berry on the night of February 27, 1996, and that he helped carry assault rifles from a white Cadillac into Davis's room in the Herman Street apartment. Loyal saw a backpack with guns in it and noticed that Davis was wearing a gold chain with a cross on it. According to Loyal, Davis said that they had gone to get some guns and that he "unloaded his clip." Davis told Loyal that one of the victims had begun crying and begging for his life, and that they shot him. Loyal said that Berry seemed upset about what had happened but Davis just appeared "hyper."

Detectives Mike Roland and Pat Postiglione were assigned to investigate the homicides of Gregory Ewing and D'Angelo Lee after the victims were found on the morning of February 28, 1996. Later that morning, Postiglione, along with two other detectives, went to an apartment at 2716–B Herman Street to investigate a tip they received from "Crimestoppers" regarding an unrelated murder that had occurred near Tennessee State University ("TSU"). While the detectives were questioning Ronald Benedict, the lessee of the apartment, and fourteen-year-old Antonio Cartwright, they noticed a rifle under a bed in an adjacent room.

As the detectives were discussing a search of the apartment, Christopher Davis walked in unannounced with Dimitrice "Dee" Martin, Berry, and Brad Benedict, Ronald Benedict's brother. Davis was talking on a cell phone and one of the other men was carrying an assault rifle. When the detectives announced their presence and drew their weapons, Davis, Berry and Brad Benedict fled from the apartment. Davis was caught one block from the apartment. A .45 caliber automatic handgun that Davis had discarded during the chase and the assault rifle that one of the other men had been carrying were also recovered. Berry and Brad Benedict, however, were not apprehended that day.

Davis was arrested, taken back to the apartment on Herman Street, and placed in a patrol car while the apartment was searched. Davis denied that he lived in the apartment. The search of Davis's bedroom uncovered a nine millimeter handgun, an M–1 assault rifle, three SKS assault rifles, several handguns, ammunition, $1,400 in currency inside a Crown Royal bag, two pair of muddy

3

gloves, muddy tennis shoes, handcuffs, a pager, a cell phone, and a backpack containing cans of spray paint. Detective Postiglione also saw a pair of green tennis shoes with yellow laces that were later identified as belonging to the victim, D'Angelo Lee.

Davis was taken to the Criminal Justice Center in the back of a patrol car with Antonio Cartwright. Cartwright testified that while riding in the patrol car, Davis told him to remove the gold cross necklace from Davis's neck and to place it in Davis's pocket.

Dimitrice Martin testified that she was Davis's girlfriend. While she waited with Davis at the Criminal Justice Center, he asked her to take a gold cross necklace from his pocket and put it in her purse. Davis then told her that Berry and several others had purchased guns the previous night and had returned to the Herman Street apartment with the victims tied up in their car. [Footnote: Martin testified that she had heard Davis and Lee discussing the purchase of guns on the evening of February 27, 1996. Later that evening, she saw Davis and Berry return to the apartment on Herman Street with assault rifles, green and gold tennis shoes, a coat, and a duffle bag.] Davis told her that he and Berry then drove somewhere, took the victims from the car, and began shooting the victims. Davis also told her that Berry had shot both of the victims and that he, Davis, shot D'Angelo Lee. Davis then told Martin to call Ronald Benedict's girlfriend and ask her to "get rid of" a pair of green and gold tennis shoes left in the apartment. Finally, Martin testified that she received two letters from Davis following his arrest in which he told her to "take the fifth" and not testify against him or in cases involving other members of the Gangster Disciples. [Footnote: Martin testified that she had pending charges against her for murder, especially aggravated kidnapping, specially aggravated robbery, and eleven counts of aggravated robbery. She said that she had not been promised anything for her testimony, but she hoped her testimony would warrant consideration in her pending cases.]

Detective Roland interviewed Davis regarding the homicides of Ewing and Lee. Because another detective had previously questioned Davis about the unrelated murder near the TSU campus, Roland confirmed that Davis had been advised of his rights and was willing to talk. Davis denied that he was involved in or had any knowledge of the Ewing and Lee homicides. Detective Roland stopped the interview after 30 minutes because Davis requested an attorney. According to Roland, however, he was later typing up criminal warrants to charge Davis with the Ewing and Lee homicides when Davis told

4

him he wanted to talk to him.

Davis signed a written waiver of his rights and gave a videotaped statement. He said that Gdongalay Berry and Yakou "Kay" Murphy met with Ewing and Lee to buy guns and later returned in a Cadillac with the victims tied up in the car. After Berry brought the guns into the Herman Street apartment, Davis accompanied Berry and Murphy in the Cadillac to another location where they got the victims out of the car. Davis told Detective Roland that Berry shot Ewing five times with a .45 caliber handgun and that Murphy shot Lee four times in the back of the head with a nine millimeter handgun. Davis said that they returned to the Herman Street apartment after burning the car. [Footnote: Davis later sought suppression of his statement on the basis that he was feeling ill, that he did not recall being read his *Miranda* rights, and that officers had "coerced" Davis by showing him the evidence that was being collected and by telling him that others had been making statements about the offenses. The trial court denied the motion to suppress, and the Court of Criminal Appeals correctly affirmed the trial court's ruling.]

The victims' family members identified evidence that was recovered from the investigation. Willie Mae Lee, D'Angelo Lee's mother, testified that the gold cross necklace that was being worn by Davis after the offenses had belonged to her son. Lee testified that her son had been wearing green tennis shoes with yellow laces when he borrowed her car, a white Cadillac, on the evening of February 27, 1996. Brenda Ewing Sanders, Gregory Ewing's mother, testified that a jacket found in the Herman Street apartment had belonged to her son.

The medical examiners who performed the autopsies of the victims were no longer employed by the medical examiner's office and lived out of state. As a result, Dr. Bruce Levy testified about their findings. [Footnote: The trial court overruled objections to Dr. Levy's testimony made by defense counsel, and the Court of Criminal Appeals affirmed the trial court's ruling.] Dr. Levy testified that Gregory Ewing had been shot seven times, including three shots to his head. Bullets recovered from Ewing's shoulder and abdomen appeared to be a different caliber than one recovered from his head. Dr. Levy testified that D'Angelo Lee had been shot three times in the head and once or twice in the hands. One bullet was recovered from the hand wounds.

Tommy H. Heflin, the supervisor of firearms identification with the Tennessee Bureau of Investigation, testified that he received the bullets that had been recovered from the victims' bodies, a nine millimeter handgun, two .45 caliber

handguns, four fired cartridges from a .45 caliber handgun, and eight fired cartridges from a nine millimeter handgun. Heflin concluded that the nine millimeter bullets recovered from the victims had been fired from the nine millimeter handgun that he tested. Although Heflin could not conclude with "absolute certainty" that the nine millimeter cartridges had been fired from the nine millimeter handgun that he tested, he concluded that they had been fired from that handgun or one very similar. Heflin testified that the four .45 caliber cartridges had been fired from the same handgun but not from the two .45 caliber handguns he had been given to examine. He likewise concluded that two .45 caliber bullets recovered from the victims had been fired from the same handgun.

Following the prosecution's case in chief, the defense presented the testimony of the defendant Davis's grandmother, Susie Boykin. Boykin, who lived five or six blocks from the Herman Street apartment, testified that on February 27, 1996, Gregory Ewing stopped by her house looking for Davis. When Davis later arrived at her house at about 7:00 p.m., she told him that Ewing was looking for him. Davis left but returned a short time later and said he could not find Ewing. According to Boykin, Davis ate dinner with her and stayed until 10:15 p.m. At that point, she asked Davis to stop coming in and out of the house because she needed to get to sleep.

Dallas Blackman testified that he saw Davis and Antonio Cartwright at the Court Villa apartments on February 27, 1996, sometime between 9:30 p.m. to 10:30 p.m. Blackman was with Davis and Cartwright for about 45 minutes. According to Blackman, Davis asked him to rent a motel room for him that evening, but that was not unusual.

Donald Moore testified that Yakou Murphy told him that he killed Ewing and Lee after tying them up and making them get on their knees. According to Moore, Murphy said he never liked Ewing and that he had "set up" Davis, Berry, and Moore. Moore conceded that Murphy had testified against him in unrelated cases in which Moore was convicted of first degree murder, second degree murder, and especially aggravated robbery. Moore also acknowledged that he was Davis's best friend.

Yakou Murphy testified that he did not kill Ewing or Lee and that he was not involved in the murders. He also denied that he had told anyone he killed the victims. Murphy testified that Davis and Berry had asked him to go with them to buy guns and that he saw Davis and Berry driving a white Cadillac with two

6

men who appeared to be tied up. Murphy testified that he knew Davis and Berry had handguns and that later that evening, he saw them carrying clothes, shoes, and assault rifles into the apartment.

The defendant, Christopher Davis, age 18 at the time of the offenses, [Footnote: Davis admitted that he was involved with the "Gangster Disciples" and that he had been selling cocaine since he was 13 or 14 years of age.] testified that he went to the home of his grandmother, Susie Boykin, at about 6:45 to 7:00 p.m. on February 27, 1996, and that he returned around 7:15 to 7:20 p.m. after leaving briefly to look for Ewing. Davis testified that he left his grandmother's house several times to smoke marijuana with Antonio Cartwright and to sell cocaine. Davis said that after leaving his grandmother's home around 10:15 p.m., he returned to his apartment on Herman Street where Yakou Murphy asked him to help carry guns and other items into Davis's bedroom. Davis testified that Murphy told him that he and Berry had robbed someone, and that Berry later said that he and Murphy shot Ewing and Lee. Davis stated that he purchased a necklace from Berry for $200. Davis testified that his statement to police was a "big lie," that he had not been feeling well in the days before his arrest, and that he had recently received a blood transfusion at Vanderbilt Hospital for an apparent spider bite.

Dr. Steven Wolff testified that Davis had been admitted at Vanderbilt on February 18, 1996, and had been given a blood transfusion to treat anemia. Wolff testified that Davis had a lesion on his arm that was consistent with a spider bite and that such a bite could result in anemia. Wolff testified that Davis did not appear to be in distress and that Davis had a normal red blood cell count when he was discharged.

After hearing the evidence and deliberating, the jury convicted Davis of two counts of premeditated first degree murder, two counts of felony murder, two counts of especially aggravated kidnapping, and two counts of especially aggravated robbery. After the trial court merged the felony murder convictions with the premeditated first degree murder convictions, a sentencing proceeding was conducted to determine punishment.

*Sentencing Phase*

In the sentencing phase of the trial, the prosecution relied on three aggravating circumstances in seeking the death penalty: that the defendant was previously convicted of one or more felonies whose statutory elements involved the use

7

of violence to the person; that the murders were committed for the purpose of avoiding, interfering with, or preventing a lawful arrest; and that the murders were knowingly committed, solicited, directed, or aided by the defendant while the defendant had a substantial role in committing or attempting to commit a robbery or kidnapping. Tenn. Code Ann. § 39–13–204(i)(2), (6), and (7) (2003).

In support of the prior violent felony aggravating circumstance, the prosecution introduced evidence that Davis had prior convictions for first degree murder and attempted second degree murder. The prior first degree murder conviction occurred in 1999 and the prior attempted second degree murder conviction occurred in 1997.

In addition, the prosecution presented the testimony of Brenda Ewing Sanders, Gregory Ewing's mother, who testified that her son was 18 years old when he was killed. She testified that Ewing had been a "good boy," who had a young daughter. Similarly, Willie Mae Lee, D'Angelo Lee's mother, testified that her son was 19 years of age when he was killed and that she had a close relationship with him. She testified that her son had a six-year-old son who believed his father would come home after the trial.

The defense presented numerous witnesses in mitigation. The defendant's mother, Felicia Davis, testified that she had attended college and had maintained regular employment while the defendant's father, Christopher Davis, Sr., stayed home with the children and sold illegal drugs. As a result, Davis spent a lot of time with his grandmother. Ms. Davis testified that she and her husband were addicted to drugs and that her husband had been incarcerated several times for drug-related offenses. She testified that Davis's brother was killed in a drug deal several months before the defendant's trial.

Witnesses described Davis as bright, intelligent, and stubborn. He attended private schools until the ninth grade and was a "fast learner." He was a good student and was once listed in "Who's Who Among American High School Students." Davis started having behavior problems, however, was expelled from private school for threatening a teacher, and then transferred to a public school. He dropped out of school in the eleventh grade.

Donald Moore testified that Davis had been selling marijuana and cocaine and that he and Davis smoked marijuana every day. According to Moore, Davis's attitude changed after he left private schools, and he enjoyed the fact that his father was a popular drug dealer. Similarly, Marcus Lattimore, the defendant's

8

cousin, testified that there was drug use in the Davis family and that Davis began selling drugs so that he could get money to obtain a recording studio.

*State v. Davis*, 141 S.W.3d 600, 606-11 (Tenn. 2004). The supreme court affirmed the Petitioner's convictions and sentences. As noted above, the Petitioner's co-defendant was tried separately and received the same sentences. *See State v. Berry*, 141 S.W.3d 549 (Tenn. 2004).

## Post-Conviction

The Petitioner timely filed his petition for post-conviction relief in August 2005. The trial court appointed private counsel who filed an amended petition in April 2007. The trial court conducted an evidentiary hearing over the course of eight days in March, April and July 2009. On April 6, 2010, the trial court filed its written order setting forth its findings of fact and conclusions of law. The trial court denied the Petitioner a new trial, but granted the Petitioner a new sentencing hearing. One of the Petitioner's two prior convictions (first degree murder) which formed the basis for the prior violent felony aggravating circumstance has since been overturned and the trial court concluded its use could not be considered harmless. The Petitioner is appealing the denial of a new trial. The State is appealing the granting of a new sentencing hearing. Berry was also denied a new trial but granted a new sentencing hearing. This Court has already affirmed the post-conviction ruling in Berry's case. *Berry v. State*, 366 S.W.3d 160 (Tenn. Crim. App. 2011), *perm. to app. denied*, (Tenn. 2012).

## Evidentiary Hearing

At the time of his appointment on this case in November 1997, Hershell Koger had been practicing law for approximately four years. Koger was initially appointed as co-counsel; Niles Nimmo had already been appointed as lead counsel. Koger subsequently became lead counsel in March 2000 after Nimmo was allowed to withdraw. David Hornik was appointed as co-counsel with Koger. Koger, who resided in Pulaski, testified that this was the first criminal case he tried in Nashville. It was also his first death penalty trial. Koger testified though that he had received the requisite training to handle capital cases and was qualified under the Rules of the Supreme Court. Koger testified that, although counsel filed a motion for a change of venue, when they learned the trial would be moved to East Tennessee they changed their mind. Koger testified that despite the pretrial publicity he did not believe it ended up causing any problems with the trial of the case in Nashville.

Koger testified that because he lived in Pulaski he was unable to maintain regular contact with the Petitioner in person, but he believed he and the Petitioner "always got along

very well and communicated well with each other." Koger considered the Petitioner to be a fairly bright individual and testified that he never had any difficulty communicating with the Petitioner. Koger said the Petitioner was actively involved in his case. Koger acknowledged that the Petitioner filed a complaint against him with the Board of Professional Responsibility because he allegedly had not visited the Petitioner in the six weeks after having been appointed lead counsel. Koger testified about the numerous meetings he had with the Petitioner after that, however.

Koger submitted a bill for compensation claiming 1,436 hours of work on this case. He stated, though, that approximately ten to twenty percent of the work he actually performed was not included in his time sheets. Koger testified that he was also working on another death penalty case at the same time as this one, but he said the other case was in the beginning stages so it did not interfere with his work on this one.

According to Koger, during their time working together, Nimmo focused on the facts of the crimes while Koger dealt more with the pretrial motions and the mitigation aspect of the case. Koger testified that there really was no primary caregiver in the Petitioner's life, but he said he discussed the Petitioner's case with his grandmother on a regular basis. Although Koger did not remember personally meeting the Petitioner's mother prior to trial, his investigator traveled to California to interview both parents.

Koger stated that "the theory of defense in this case [was] always a moving target." Counsel initially attempted to establish an alibi as well as present evidence of the Petitioner's impaired capacity due his weakened state of health resulting from the effects and treatment of the spider bite. Koger acknowledged that those two theories were not necessarily consistent with one another, but he testified that they did not have any single, great defense on which to rely. As such, Koger said the defense attempted as much as possible to generally attack the State's evidence in hopes of creating a reasonable doubt in the mind of the jurors.

According to Koger's testimony, from late 1998 through February 2000, he did little work on the mitigation aspect of the case. Koger further testified that there were no regular defense team meetings about the case prior to 2000. Koger was aware that the Petitioner started smoking marijuana regularly and dealing drugs at a very young age and he agreed that the jury should be made aware of that. Koger also knew the Petitioner drank alcohol regularly while he was underage. Accordingly, Koger sought the assistance of an addictionologist, Dr. Murray Smith. Koger did not recall, however, why he waited to contact Dr. Smith until just some three months before trial. Nor did Koger remember whether they initially contacted Dr. Smith regarding his expertise on addictions or with respect to the Petitioner's health issues related to the spider bite.

Koger stated that he considered the circumstances surrounding the spider bite to be relevant mitigation evidence. The Petitioner left the hospital against medical advice after his initial treatment for the spider bite and then had to be readmitted for blood transfusions several days later. However, Koger testified that he did not recognize at that time the relevance of the effects of the transfusions on the Petitioner's health. According to one medical report, the Petitioner stated that he lost his appetite and was weak after he left the hospital. Koger, however, did not have the Petitioner fully evaluated by a medical doctor prior to trial to determine if there were any resulting health effects that may have been useful in defense. Koger testified that Dr. Wolff was "the best witness [they] had, extremely credible . . . he came across beautifully in front of the jury and when Mr. Thurman went to cross-examine him . . . he handled himself very very well." Koger thought Dr. Wolff would simply testify about the fact that the Petitioner was treated for a spider bite. According to Koger, though, because Dr. Wolff's testimony about how the effects of the spider bite affected the Petitioner's health was better than he could have imagined, Koger did not consider Dr. Smith's testimony on the same subject to be necessary.

Koger testified that, although Dr. Wolff was able to effectively convey to the jury that the Petitioner was in a weakened state of health as a result of the spider bite, and although there were medical reports reflecting the same, the Petitioner's own testimony "gutted" that information. The Petitioner testified, however, that he felt just fine the day of the crimes. When questioned why he did not ensure that the Petitioner's testimony would be consistent with the other evidence, Koger stated that "the big problem with that is that [counsel] didn't know what [the Petitioner] was going to testify to before he got on the stand." Koger testified that defense counsel asked the Petitioner several times what the substance of his trial testimony would be. According to Koger, the Petitioner replied simply, "don't worry about it." Koger stated that the Petitioner did not inform defense counsel the extent of how the spider affected him; "the primary source of that [was the Petitioner] and we didn't get that." Koger admitted that he did not interview any of the Petitioner's roommates to ascertain their perception of the Petitioner's physical condition following the spider bite.

According to Koger, although the Petitioner told counsel in the beginning that he intended to testify in his own defense, he never informed counsel what he would say on the stand. Koger testified that he advised the Petitioner against testifying at trial because of the Petitioner's refusal to inform counsel in advance what he intended to say on the witness stand. In fact, defense counsel informed the trial court during trial that the Petitioner was testifying against counsel's advice. Koger said that he "hate[s] to be the last person in the room that knows what is going to happen at a trial, but it kind of worked out that way with [the Petitioner] on the stand. I am sorry to say." Koger also stated: "I was upset with [the Petitioner's] testimony more so than I had ever been before or since with any witness that I have ever had." Koger admitted that the Petitioner's trial testimony ultimately presented the

11

defense team with a "big problem." According to Koger, the Petitioner's trial testimony "effectively gutted any, any headway" they had made with respect to evidence about the spider bite's effect on the Petitioner's state of health. The Petitioner testified that he had no lingering effects from the spider and was feeling fine the night of the murders. He also testified that his previous statement about his involvement in the crimes was untruthful. Because of the Petitioner's testimony, Koger decided not to call Dr. Smith, whose testimony would have contradicted the Petitioner's. Koger did not want to introduce evidence which would have impeached the testimony of his own client. In addition to the Petitioner's own statements, Koger acknowledged that the circumstantial evidence presented by the State was difficult to overcome, even without Cartwright's testimony. Koger stated that "we just did not have a very good horse to ride."

After the Petitioner testified, Koger remembered discussing the matter with the defense team and thereafter decided not to call Dr. Auble as a witness during sentencing. Considering the content of the Petitioner's trial testimony, during which he contradicted his earlier statements, Koger concluded that her evaluation of antisocial personality disorder would not sit well with the jury, especially when the State could solicit during cross-examination the traits associated with the condition such as deceitfulness. Koger decided that the positive aspects of Dr. Auble's testimony would have been outweighed by the negative, effectively discrediting her value as a mitigation witness. Dr. Auble reported that the Petitioner showed a lack of remorse about the victims' death, and Koger testified that information alone would have negatively impacted the jury during sentencing. During the sentencing phase, the Petitioner affirmed to the trial judge that he agreed to forego the presentation of any mental health evidence in mitigation. Koger testified that the decision to forgo that type of evidence was made after a thorough review of all the available mental health reports.

Koger testified that he felt uncomfortable dealing with any psychological issues arising in his cases and thus he deferred to the opinions of his experts. Accordingly, Koger relied on Dr. Auble to provide him with a psychological diagnosis of the Petitioner in this case. Koger informed Dr. Auble about the spider bite and the Petitioner's subsequent hospitalization, but he told her that he knew of nothing else remarkable about the Petitioner's mental health history. Koger provided Dr. Auble with some basic information with the understanding that she would conduct an appropriate evaluation and report what she learned, but he stated that it would have been presumptuous of him to otherwise tell her how to conduct her evaluation. Koger testified that he did not know what he had to work with until Dr. Auble performed the evaluation. According to Koger's testimony, however, he had infrequent communications with Dr. Auble between the time he retained her services and the start of trial. Koger did state that he provided Dr. Auble with any relevant material the defense team obtained regarding the Petitioner.

12

Koger did not remember why he provided the State with statement summaries of defense witnesses which did not qualify as *Jencks* material. Koger testified that defense counsel made all the necessary *Brady* requests related to impeachment material of the State's witnesses. Although Koger did not obtain a copy of Cartwright's juvenile record, he agreed that Cartwright's juvenile record contained *Brady*-type impeachment evidence which he had sought from the State. Koger recalled that Cartwright seemed to be a credible witness, but he said that some of the information contained in his juvenile record could have been used to impeach his testimony. Specifically, Cartwright's juvenile record contained a statement that he witnessed a gang-style killing in February 1996, which apparently contradicted the statement he gave to the police in this case wherein he denied being present when the victims were killed. In addition, Koger admitted that he would have liked to have known about Cartwright's mental health evaluations.

Although Koger attended Berry's trial, he testified that he unaware until he read the appellate court opinions that Cartwright's testimony at Berry's trial was different than his testimony at the Petitioner's trial regarding which of the two defendants uttered the statement that the victims would have to be killed after they were robbed. Koger testified that if he knew Cartwright attributed the statement to Berry during Berry's trial he would have cross-examined Cartwright about his inconsistent testimony at the Petitioner's trial. Koger believed the jury's knowledge of the inconsistent testimony could have had a bearing on residual doubt during sentencing. Koger stated that he was unaware of a police report containing a statement Cartwright made implicating himself, Berry and another individual in a separate armed robbery. Regarding the possibility of impeaching Cartwright with his seemingly inconsistent testimony, Koger admitted that there was enough circumstantial evidence otherwise supporting the State's argument to the jury that the murders were premeditated. Koger agreed that there did not have to be any evidence indicating that the Petitioner said the victims would have to be killed. Similarly, Koger acknowledged that the defendants were charged with felony murder in addition to premeditated first degree murder.

Koger did not interview Murphy prior to trial and he did not recall reviewing a taped interview of Murphy by the police regarding his involvement in this case. Koger testified that the information contained in the taped interview would have assisted in their defense of the case, possibly to impeach Cartwright's testimony. Nevertheless, Koger knew that Murphy was interviewed by the police and, in fact, called him as a witness in defense. Koger testified that someone on the defense team would have interviewed Murphy prior to trial since he was a defense witness. According to Koger, because of the number of other guns involved in the case, he did not believe it would have been beneficial to reiterate the fact that the weapon the Petitioner discarded when he fled the police prior to his arrest was not linked to the homicides. Koger did not recall considering hiring a soil expert.

During cross-examination, Koger was questioned specifically about the entries on his time sheets, which included accounts of court hearings, client visits, meetings with co-counsel, the investigators and expert witnesses, and other activities performed in preparation of trial. Koger testified that prior to trial he was working "ridiculously" long hours on both phases of the trial. Koger testified that he reviewed Nimmo's file as well as all of the evidence in this case and kept in constant contact with the investigators. The State provided open discovery and Koger did not recall seeing any surprise evidence at trial. Koger recalled that, in addition to the attorneys, the defense team consisted of six investigators, a jury consultant, and Drs. Pamela Auble and Murray Smith.

David Hornik was appointed as co-counsel in March 2000. Hornik testified that he essentially served as Koger's "gopher." Hornik stated that this was his first death penalty case, and it was also the first case he was responsible for preparing a mitigation-type defense. Hornik, however, had taken a continuing legal education course in capital case work prior to his appointment and was thus qualified under the applicable supreme court rule. He had also previously handled homicide cases. Hornik testified that his time sheets were stolen out of his automobile so he never submitted a fee claim in this case. He stated, though, that he performed some work on this case every day between his appointment and the trial. Like Koger, Hornik did not believe the anonymous jury posed any problems to the defense.

Hornik recalled that Dr. Auble diagnosed the Petitioner with antisocial personality disorder. He also recalled that Koger investigated the physiological and psychological effects the spider bite and subsequent treatment had on the Petitioner. Hornik could not specifically recall his strategy during the opening statements at trial, but he stated his remarks were "very conservative" "because in a case of this nature with the statements of the proof [it] was going to be . . . like tip-toeing through a mine field." Hornik did not want to emphasize to the jury during opening arguments the fact that the Petitioner gave a statement to the police. Hornik said his practice during opening was to maintain credibility with the jury without trying the case or highlighting any defense weaknesses. Moreover, Hornik testified that before he made his opening remarks to the jury he did not know whether the Petitioner was actually going to testify at trial.

Hornik affirmed that the defense strategy was to vigorously cross-examine the State's witnesses in order to create a reasonable doubt in the jury's mind. Like Koger, Hornik strenuously objected to the Petitioner's decision to testify and he stated that "a lot of our defense strategy was absolutely torpedoed by what he said on the witness stand." Hornik further testified: "I will be very frank with you. [The Petitioner's] testimony in his own defense was the one greatest single item of proof that the State had to convict [him]." Hornik also testified that the Petitioner did not inform counsel ahead of time what he planned to tell the jury. Although the jury heard evidence describing the Petitioner's physical condition

after his treatment for the spider bite, Hornik testified that any hope of that evidence supporting their defense was lost when the Petitioner testified that he felt just fine the night of the murders. Similarly, because of the Petitioner's testimony, Hornik said he and Koger decided not to call Dr. Smith as a mitigation witness.

Hornik agreed it would have been important from the defendant's prospective to impeach the credibility of Cartwright. Hornik did not remember reviewing any summary of Cartright's testimony during Berry's trial or any of Cartwright's mental health records. Nor did Hornik remember hearing that Cartwright said he witnessed a gang-style killing in 1996 or was allegedly involved in an armed robbery several days before the crimes in this case. Hornik did not recall seeing Murphy's taped statement to the police.

Hornik believed he did his best during sentencing to convey to the jury that the Petitioner's childhood was difficult because his parents abused drugs, his father was imprisoned on drug related offenses, and his grandmother took care of him most of the time. Hornik testified that he maintained a close working relationship with the investigation team. According to Hornik, Dr. Auble was not called as a witness because her diagnosis did not present favorable or meaningful mitigation evidence. Like Koger, Hornik believed her reports would have been more harmful than helpful. Hornik testified that they needed to retain as much credibility with the jury during sentencing, especially after the Petitioner testified during the guilt phase, and because counsel did not believe the mental health evidence would have been helpful in mitigation they did not want to use it simply as a "hail Mary to see, throw something up [against] the wall and see what sticks."

Hornik also testified that the Petitioner was very active in his own defense. Hornik considered the Petitioner to be a bright individual who understood everything the attorneys discussed with him about the case. According to Hornik, the Petitioner agreed, after discussions with counsel, to forego the presentation of any mental health evidence in mitigation. Hornik testified that they did not have a mental health defense to use during the guilt phase of the trial.

Niles Nimmo represented the Petitioner on three different cases, including the two other cases which resulted in the convictions used to support the prior violent felony aggravating circumstance in this case. Nimmo moved to withdraw from this case once the State filed its notice of intent to seek the death penalty because he believed he did not have the requisite experience. The trial court, however, denied his request to withdraw on that basis. Nimmo was eventually relieved as the Petitioner's counsel because the Petitioner had filed a post-conviction petition in one of the other two cases challenging the effectiveness of Nimmo's representation. Nimmo testified that he probably spent somewhere between four to five hundred hours working on this case before he was allowed to withdraw.

15

According to Nimmo, he was primarily responsible for the guilt phase investigation and Koger handled the mitigation. Nimmo testified that he did not have much interaction with Inquisitor, Inc., because the mitigation aspect of the case was Koger's responsibility at the time. Nimmo stated that he did not direct Koger to pursue any particular course in terms of mitigation, and by the time he withdrew from the case Nimmo did not know what direction the defense was going to take during sentencing.

Nimmo testified that motions to suppress evidence recovered from the Petitioner's residence and to suppress the Petitioner's statement to the police were unsuccessful. Nimmo testified that he reviewed the State's file as part of his discovery request. Nimmo testified that he made a *Brady* request as well. Nimmo recalled Yakou Murphy's trial testimony in the Frierson case and knew that Murphy gave a taped statement to the police on March 14, 1996. According to Nimmo, Murphy told him that his statement to the police was untruthful. Nimmo testified, though, that he did not have any independent recollection whether his file in this case contained a copy of the tape of Murphy's statement to the police. Nimmo acknowledged that he could have requested Cartwright's juvenile records but he did not remember seeing them. Nimmo testified that this case was not easy to defend and that he believed there was an extremely strong case of guilt considering, in particular, the Petitioner's statements to the police.

Julie Hackenmiller was a mitigation specialist employed by Inquisitor, Inc., the outfit hired by Koger to assist with the investigation. She testified about the nature of her work on the case, which included gathering information and records about the Petitioner, as well as his family members, and interviewing people who knew the Petitioner. She identified several visual aids she prepared in the case: a family tree, a timeline of significant events occurring in the Petitioner's life, and a chart identifying various influences in the Petitioner's life. She also identified photographs of the Petitioner and his family she obtained during her investigation. Hackenmiller compiled a summary of mitigation themes which she gave to counsel for use at trial. Hackenmiller also prepared a graph depicting the crime statistics for the Petitioner's neighborhood between 1990 and 1996.

Hackenmiller identified several letters she wrote to trial counsel, including one dated October 13, 1999, wherein she inquired about counsel's failure to respond to her and her colleagues' previous letters concerning the status of the case and request for additional funding. During the time Hackenmiller complained she did not receive any response from counsel, issues were being pursued by counsel in more than one interlocutory appeal. Hackenmiller also identified memos prepared by her or her staff summarizing interviews of witnesses. Hackenmiller testified that she visited the Petitioner's parents in California during which time she interviewed them for seven or eight hours. She recalled "it being very erratic

16

or difficult to focus them on the topic. There were lots of people in and out of the house that day."

During cross-examination, Hackenmiller acknowledged that at least four other employees of Inquisitor, Inc., also worked on this case. Billing records reflected that Inquisitor, Inc., was paid approximately $40,000 for over 600 hours of work on this case. Hackenmiller testified that she was a licensed private investigator but that there was no independent certification available for a mitigation specialist. Hackenmiller reviewed the time sheets submitted in this case which reflected the numerous times she communicated and met with counsel and the various witnesses, the defense experts and the Petitioner, prior to trial. Hackenmiller acknowledged that her and her colleagues conducted an extended and intensive investigation in this case.

Dr. Pamela Auble testified as a clinical neuropsychologist at the evidentiary hearing. She stated that she was first contacted by Koger about this case in December 1997. According to Dr. Auble, she was requested to determine the Petitioner's competency and sanity and also to look into potential mitigation themes. Dr. Auble identified the court order, filed March 27, 1998, approving initial funding for her services in the amount of $1,500, which was less than the $5,000 she informed Koger she would require. She testified, though, that Koger did not contact her again after their initial conversation in December 1997 until May 12, 1998. According to Dr. Auble, at that time the trial was scheduled to begin in July 1998. Dr. Auble first interviewed the Petitioner for a couple of hours on June 9 and 10, 1998. Dr. Auble stated, though, that she never performed a full neuropsychological evaluation of the Petitioner. Following her initial meeting with the Petitioner, and because she believed the Petitioner tended to minimize the problems in his life, Dr. Auble informed counsel that she needed a better social history of the Petitioner, including any of his medical and school records and additional details about the pending charges. Dr. Auble testified that she did not hear back from counsel until November 21, 1998, when counsel informed her that the trial date was rescheduled to February 8, 1999. According to Dr. Auble, however, counsel did not forward her the information she requested.

Dr. Auble testified that in January 1999, Dr. Thomas Schacht, the State's expert, requested her report. Although she provided it to Dr. Schacht, she said she felt uncomfortable preparing a report after only her initial interview with the Petitioner and without having reviewed any of the information she previously requested from counsel. Dr. Auble did not perform any other work on the case until she was contacted by Koger on or about March 29, 2000. Because she did not receive the information she previously requested from counsel, she assumed the case may have settled. However, Koger informed Dr. Auble that the trial had been rescheduled to begin July 24, 2000. Koger requested that Dr. Auble continue with her evaluation of the Petitioner. Dr. Auble testified that she received some of

the background information from the investigators on April 17, 2000. On April 27, 2000, the trial court approved an additional $7,500 of funding for Dr. Auble's services. Dr. Auble said she spent approximately twenty-five hours working on this case before trial.

Dr. Auble testified that counsel did not ask her to determine whether the Petitioner had low serotonin levels, but she stated that he exhibited some of the risk factors associated with low levels, such as neglect, abuse and alcoholism. Dr. Auble testified that she met with both attorneys and the investigators together for the first time on June 13, 2000. Dr. Auble prepared a second report in July 2000, about a week prior to the start of trial. By that time, she stated she had reviewed the information previously requested, except for the trial discovery materials. Dr. Auble stated though that she did review the police reports, including the interview of the Petitioner. Based upon her knowledge of the Petitioner's history of substance abuse, Dr. Auble referred defense counsel to Dr. Smith. Dr. Auble, however, did not review any report prepared by Dr. Smith. Dr. Auble testified that counsel did not prepare her to testify at trial, which she said was unusual in her experience. Dr. Auble stated that she was notified by Koger on July 25, 2000, that she would not be testifying during sentencing.

Testifying about her evaluation of the Petitioner, Dr. Auble stated that he tended to minimize the bad events in his life. She stated that defendants facing the death penalty often did that, and that is why it was important for her to review information from other sources. Dr. Auble determined that the Petitioner's I.Q. was 93 and that he had no significant cognitive deficits. Dr. Auble found the Petitioner to be impulsive and self-focused, i.e., egocentric and self-centered. Dr. Auble stated that the Petitioner's alcohol and drug use exaggerated his impulses. According to Dr. Auble, the Petitioner did not trust people and thus had difficulty developing close relationships. Dr. Auble did not find the Petitioner to be depressed or anxious. Dr. Auble rendered a diagnostic impression of the Petitioner for antisocial personality disorder and a history of polysubstance (alcohol and marijuana) abuse. Dr. Auble explained that the diagnostic impression was not a formal psychological diagnosis because she was unable to review all of the relevant records and reports. During her screening evaluation of the Petitioner, Dr. Auble administered seven different psychological tests, whereas in a full neuropsychological evaluation she performed twice as many tests on a patient.

During cross-examination, Dr. Auble testified that the Petitioner was not incompetent, insane or mentally retarded. Dr. Auble further testified that the Petitioner did not have any neurological problems or history of head injuries. Dr. Auble acknowledged that a diagnosis of antisocial personality disorder includes traits of nonconforming behavior, deceitfulness, impulsiveness, irritability, aggressiveness, irresponsibility, and lack of remorse. Dr. Auble stated that she had read a report wherein the Petitioner was alleged to have laughed about the

18

deaths of the victims. She had also read a report which alleged that the Petitioner remarked about assaulting his girlfriends.

Dr. Murray Smith, a medical doctor specializing in addiction medicine, testified that Koger first contacted him shortly before April 26, 2000, to conduct an evaluation of the Petitioner. Dr. Smith understood that his evaluation of the Petitioner's drug and alcohol abuse and effects of the spider bite could assist defense counsel with their mitigation proof. Dr. Smith interviewed the Petitioner, reviewed Dr. Auble's initial report and the Petitioner's medical records from Vanderbilt Hospital and Metro General Hospital, where he had been treated for the brown recluse spider bite, and reviewed the videotape of the statement the Petitioner gave to the police after his arrest. Dr. Smith stated that the Petitioner provided him with some social history but he also received some information about the Petitioner's family from defense counsel and the investigators. Dr. Smith testified that children of addicts have a strong genetic predisposition to become addicts themselves.

According to the medical reports he reviewed, Dr. Smith stated that the Petitioner had been diagnosed with hemotylic anemia (destruction of red blood cells) and rhabdomyolysis (destruction of muscle cells). Dr. Smith understood that the Petitioner lost three-quarters of his red blood cells and that, as a result, risked kidney failure. The Petitioner received blood transfusions. According to the initial discharge report, though, Dr. Smith stated that the Petitioner left the hospital against medical advice and would have been unstable. The Petitioner was informed by the hospital staff that if his cell count continued to decline he could have died. According to Dr. Smith, when the Petitioner left the hospital the first time he would have felt weak, had pain in his abdomen, and experienced shortness of breath.

Dr. Smith testified that the Petitioner's diagnosis of hemotylic anemia was extremely unusual after a brown recluse spider bite and would have confirmed the initial discharge reports that the Petitioner was "desperately ill." Dr. Smith also testified that the reports showed that the Petitioner exhibited signs of a leukemoid reaction, which meant that his white blood count was extremely elevated in an attempt to fight the infection. The reports also reflected that the Petitioner endured lesions on his liver. According to Dr. Smith, the Petitioner's marijuana use would have caused him not to care much about how he was actually feeling.

Dr. Smith testified that, given all of the reports he reviewed, the Petitioner was near death when he was admitted to the hospital the second time. However, the treatment the Petitioner received helped improve his conditions. Dr. Smith testified that the Petitioner would again have felt weak and nauseous after his second discharge from the hospital. Dr. Smith acknowledged, however, that the discharge report noted that the Petitioner's condition was stable then and that he would have been released against medical advice if he was in

19

distress. Accordingly, Dr. Smith testified that the Petitioner's condition at the time of his second discharge was not life-threatening. The Petitioner informed Dr. Smith that he did not feel well during the interview with the police. And although Dr. Smith did not review any jail records prior to submitting his report to defense counsel, he stated that the Petitioner continued to exhibit similar symptoms from the effects of the spider bite after he was arrested and taken into custody. The Petitioner continued to complain about stomach pains, was vomiting, and had blood in his urination.

Dr. Smith stated that he would have testified at trial that the Petitioner was physically ill and still suffering from the effects of the spider bite at the time he was arrested. Dr. Smith testified though that Koger informed him he would not be called as a defense witness because counsel believed Dr. Smith's testimony would not have had much value in light of the Petitioner's testimony. Dr. Smith acknowledged, though, that he had a meeting with the defense team prior to trial to go over his potential trial testimony. Dr. Smith recalled that during the meeting defense counsel were adamant about their desire that the Petitioner not testify in his own defense.

During cross-examination, Dr. Smith stated that the Petitioner informed him that he used marijuana and alcohol daily after his final release from the hospital. When questioned whether he could dispute the Petitioner's own testimony that he was feeling fine the night of the crimes, Dr. Smith replied that the videotape of the police interview which showed the Petitioner lying on the floor and evidence that the Petitioner was vomiting in jail might have disputed the Petitioner's own description of how he was feeling. Dr. Smith admitted, however, that vomiting can be caused by numerous things such as alcohol consumption and stress.

Dr. Patti Van Eys, a clinical psychologist, testified on behalf of the Petitioner at the evidentiary hearing. Dr. Van Eys stated that her practice focused on how abuse and neglect impacted the developing brain of a child. Dr. Van Eys evaluated the Petitioner prior to the hearing. Dr. Van Eys testified that the Petitioner suffered from weak or insecure attachment at an early age. As a result, the Petitioner would have lacked the ability to self-regulate, would not have had a strong sense of self worth, and would not have been able to empathize. According to Dr. Van Eys, the chaos and lack of care-giving consistency during the Petitioner's childhood were contributing factors.

Dr. Van Eys interviewed the Petitioner's mother during her evaluation. Dr. Van Eys testified that the Petitioner's mother had a hard time conveying any detailed or elaborate stories about the Petitioner's childhood. Dr. Van Eys stated that the Petitioner's parents' substance abuse was the primary contributor to the weak and insecure attachment trait exhibited by the Petitioner. Dr. Van Eys said the Petitioner's mother was extremely regretful

that her addictions took priority over her children. Although the Petitioner was clothed and fed and taken to school, Dr. Van Eys testified that the Petitioner's emotional and psychological needs were not met. Dr. Van Eys testified that the Petitioner's parents did not strike the proper balance between discipline and nurture during the Petitioner's developmental years. According to Dr. Van Eys, the children of parents who abuse drugs and alcohol or abuse and neglect their children tend to develop more behavioral and mental health problems, drop out of school and lead a life of crime.

Dr. Van Eys offered the following observations from her evaluation:

I found [the Petitioner] to be someone who is rather emotionally guarded, polite, but pretty guarded emotionally . . . because he did not have the early relationship formation developed. He still struggles with developing relationship[s] with other people . . . he does not have a good template for trusting others.

[H]is whole relationship set was underdeveloped. He has a hard time describing himself. He has a hard time . . . telling stories about himself and his experiences with other people.

During cross-examination, Dr. Van Eys acknowledged that there are numerous inconsistencies about the reports of the physical abuse the Petitioner suffered as a child, including inconsistent statements made by the Petitioner himself. She also admitted that she had very limited knowledge of the facts of the case.

Felicia Davis Gaines, the Petitioner's mother, testified on his behalf during the post-conviction hearing. She moved to California from Tennessee in 1995. She stated that the only time she spoke with Koger prior to trial was the morning of the first day of trial. She further stated that she did not have much recollection about the substance of their conversation. Gaines did not recall ever meeting Hornik. Nor did she recall speaking to Dr. Auble or Dr. Smith. She did recall meeting Hackenmiller though. Gaines admitted that she was addicted to crack cocaine when Hackenmiller visited her in California. She also stated that the Petitioner's father was selling drugs in the house during Hackenmiller's visit. Gaines testified that she answered to the best of her ability all of the questions Hackenmiller asked during the visit. She clarified, though, that she did not say anything while her husband was present that would have caused him to get angry with her. Gaines also recalled speaking on the telephone to Kelly Walker, a member of the defense team, on one occasion several months prior to trial.

21

Gaines testified that the Petitioner's father invited another women, with whom he had a romantic relationship, to live with them in the family home when the Petitioner was under a year old. Gaines also testified that the Petitioner's father raped her in front of the Petitioner when the Petitioner was under a year old. She did not report the incident to the police, nor did she report to the police any other instances of rape. Gaines admitted that she did not tell the defense investigators about these events. Gaines remained with the Petitioner's father, though, and they continued to abuse drugs together while the Petitioner was a child. Gaines testified that she was ashamed to tell her mother about her lifestyle. Gaines said she remained with the Petitioner's father because she loved him and wanted her son to have a father figure. Gaines eventually married the Petitioner's father when the Petitioner was four years old.

Gaines testified, as she did at trial, about how her children spent quite a bit of time with her mother. She added, though, that her mother worked most evenings until midnight. Gaines also testified that the Petitioner's father fathered a child with another woman while he and Gaines were still married. Gaines said her crack cocaine usage increased after that event and her attention to her children decreased. According to Gaines, the Petitioner would have been in the second or third grade about that time. When the Petitioner was about ten years old, Gaines lost her job because of her drug addictions. Gaines said her drug use, especially crack cocaine, became much more regular after she was unemployed, and she said her children would sometimes stay at her mother's for weeks at a time. After the Petitioner's father was incarcerated in 1989, Gaines moved in with her mother. However, she testified that her drug abuse continued but that she always tried to hide her drug use from her children. Gaines learned the Petitioner was selling drugs when he was about fifteen years old. Gaines stated that the Petitioner's father's family abused drugs and alcohol but that her own family never did. During cross-examination, Gaines admitted that, because she was still using drugs at that time, it was possible she could not totally recall every contact or conversation that occurred with the defense team prior to trial. Accordingly, she testified that she would not dispute any records of communications or attempted communications by the defense team. Gaines stated that her trial testimony was true to the best of her knowledge.

**Burden of Proof and Standard of Review on Appeal**

The Petitioner's post-conviction petition is governed by the Post-Conviction Procedure Act. Tenn. Code Ann. §§ 40-30-101 to -122. In order to obtain post-conviction relief, the Petitioner must show that his conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-103. The Petitioner must establish the factual allegations contained in his petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(2)(f). Evidence is clear and convincing when there is no

serious or substantial doubt about the accuracy of the conclusions drawn from the evidence. *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App.1998).

Once the trial court rules on the petition, its findings of fact are conclusive on appeal unless the evidence preponderates against them. *State v. Nichols*, 90 S.W.3d 576, 586 (Tenn. 2002) (citing *State v. Burns*, 6 S.W.3d 453, 461 (Tenn.1999)); *Cooper v. State*, 849 S.W.2d 744, 746 (Tenn. 1993). The Petitioner has the burden of establishing that the evidence preponderates against the trial court's findings. *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997). This Court may not re-weigh or reevaluate the evidence or substitute its inferences for those drawn by the trial court. *Nichols*, 90 S.W.3d at 586. Furthermore, the credibility of the witnesses and the weight and value to be afforded their testimony are questions to be resolved by the trial court. *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the trial court's application of law to its factual findings is reviewed *de novo* by this Court with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Claims of ineffective assistance of counsel are regarded as mixed questions of law and fact. *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *Burns*, 6 S.W.3d at 461. As such, the trial court's findings of fact underlying a claim of ineffective assistance of counsel are reviewed under a *de novo* standard, accompanied by a presumption that the findings are correct unless the preponderance of the evidence is otherwise. *Fields*, 40 S.W.3d at 458 (Tenn. 2001) (citing Tenn. R. App. P. 13(d)). However, a trial court's conclusions of law are reviewed under a purely *de novo* standard, with no presumption of correctness. *Id.*

## Issues

I.     *Brady v. Maryland*

The Petitioner contends that the State did not produce the following items in violation of *Brady*: (1) Antonio Cartwright's juvenile court file; (2) the videotaped statement of Yakou Murphy; and (3) statements and testimony of Dimitrice Martin from other cases. The Petitioner claims the information contained in these items could have been used to impeach the testimony of each of these witnesses.

In *Brady v. Maryland*, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). "Favorable" evidence is that which is deemed to be exculpatory in nature or that which could be used to impeach the State's witnesses. *Johnson v. State*, 38 S.W.3d 52, 55-56 (Tenn. 2001). The State's duty to disclose

23

extends to all favorable information irrespective of whether the evidence is admissible at trial. *Id.* This duty, however, does not extend to information the defendant already possesses, or is able to obtain, or to information not in the possession of the prosecution or another governmental agency. *State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992).

In order to sustain a *Brady* claim, a defendant must establish the following:

1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information, whether requested or not);

2. The State must have suppressed the information;

3. The information must have been favorable to the accused; and

4. The information must have been material.

*State v. Edgin,* 902 S.W.2d 387, 389 (Tenn. 1995). Evidence is deemed material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

[The] touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *Bagley*, 473 U.S. at 678). Materiality requires a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435. In deciding whether the evidence is material, the suppressed evidence must be "considered collectively, not item by item." *Id.* at 436.

(1) Cartwright's juvenile court file:

It is undisputed that the Petitioner made a general request for any *Brady* material possessed by the prosecution. The trial court acknowledged that some of the information contained in Cartwright's juvenile court records were favorable:

> The records contained references to Mr. Cartwright's juvenile criminal history (including criminal charges, diversions, probation violations), along with records from abuse and neglect cases involving Mr. Cartwright.

> Some of the notations indicate Cartwright was a witness to two murders while other entries indicate he was instead the witness in a double murder case. It is not clear whether the individuals writing the notations were providing their interpretation of what Cartwright had told them or were logging information that had been provided to them. The records also discuss other incidents involving Mr. Cartwright, some of which were summarized by petitioner's counsel as other bad acts. Some of these prior acts highlighted by petitioner, though not a conclusive list, were throwing a brick at a car window, removal from public schools, firing of a pistol, experiencing significant problems with ability to control his behavior, and using drugs and alcohol. Other notations indicate Cartwright had many other behavioral issues, including accusations of exposing himself sexually in public.

> Having reviewed the records, the Court finds the petitioner would likely have wanted to review these documents for potential impeachment purposes.

This Court agrees with that finding.

The trial court in this case commented that the State did not suppress Cartwright's juvenile court file in the "traditional" sense of the word. Nevertheless, the court concluded that the Petitioner satisfied the second prong of the *Brady* inquiry. This Court disagrees with that conclusion.

The Petitioner's co-defendant, Berry, raised this very same issue in his post-conviction appeal. Prior to addressing the material aspect of the evidence, this Court rejected "out of hand" Berry's contention that Cartwright's juvenile court file was in the possession of the State and that the State, therefore, had a duty to disclose it. *Berry*, 366 S.W.3d at 176. The Court observed that juvenile court files are "maintained" by the courts rather than parties to the litigation. *Id.* The Court also noted that, pursuant to the unambiguous language of the statutes governing access to juvenile court records, they are to remain confidential except under certain limited circumstances. *Id.* at 177-78 (citing Tenn. Code Ann. §§ 37-1-153 and -154). The Court concluded that none of Cartwright's juvenile court records would have

been open to the general public. *Id.* at 179. The Court observed, however, that *both* parties would arguably have had the right prior to Berry's trial to inspect the "petitions and orders" contained in Cartwright's juvenile court file. *Id.* Any "medical report, psychological evaluation or any other document" contained in the file, though, would have remained confidential to either party. *Id.* at 180. Thus, the Court concluded that Berry failed to establish that the State withheld information that was in its exclusive possession or control. *Id.* We conclude the same in the case at hand.

Nevertheless, and assuming for the sake of argument that the State suppressed Cartwright's juvenile court file, the Petitioner has failed to establish that the evidence was material. Regarding the materiality, the trial court concluded:

> Here, the challenged evidence is composed of juvenile records and medical records (referred to in the juvenile records) of . . . Cartwright. All parties likely agree that Mr. Cartwright played an important role in the State's case and was certainly an important State witness. Mr. Cartwright told the jury that he overheard the conversation about the planning of the robbery of the two victims. He also heard Berry and/or Davis say that if they robbed the two men they would also have to kill them because the victims knew Berry and Davis. It does not appear that Mr. Cartwright was named as a suspect in the homicides or otherwise participated in the actual offense. In fact, even [the Petitioner's] version, including his trial testimony, failed to implicate Cartwright. Therefore, apparently no evidence existed that Cartwright was involved in the planning or implementation of the plan discussed at the apartment.
>
> It is primarily the impeachment value of the challenged evidence that serves as the basis of petitioner's post-conviction *Brady* claim. Cartwright's credibility or character was assailed to some degree at trial. Mr. Cartwright's mere lifestyle and circumstances spoke volumes about him.
>
> Had the impeachment evidence been available to the defendant at trial, he certainly could have attempted to further impeach Cartwright's character. Of course, many of the items . . . would be questionable as to their admissibility. . . .
>
> . . .
>
> While some of the evidence, if admitted, could have further impeached . . . Cartwright, *none of the evidence altered the theory of the case or undermined the evidence presented about the robbery/murder scheme.* Only those

references to Cartwright being a witness in a double homicide case or to him having witnessed a murder approach what could be characterized as remotely material. Certainly, Cartwright admitted in these records that he was a witness in a double homicide case. It could have been useful to question Cartwright about whether he actually witnessed murders and, if so, whether he was referring to the homicides that are the subject of these proceedings. As noted above, petitioner has not cited other evidence in this record that Antonio Cartwright was a suspect in the homicides or participated in the killings in any way. Having reviewed the references highlighted by petitioner, the Court finds no basis to warrant relief. The favorable evidence could not reasonably be taken to put "the whole case in such a different light as to undermine confidence in the verdict."

(Emphasis added).

We agree with the trial court that there is no reasonable probability that, had Cartwright's juvenile court records been disclosed to the defense, the result of the proceeding would have been different. As this Court held in *Berry*, the documents containing information suggesting that Cartwright may have witnessed the murders in this case would not have been admissible at trial. *Id.* at 181. As to the evidence as a whole, the Petitioner argues on appeal that its discovery "could only have led to a more vigorous cross-examination and impeachment of the State's key witness." The trial court recognized that Cartwright informed the jury of his own delinquent and criminal lifestyle and not-so-favorable character. And while defense counsel might have been able to further impeach Cartwright's testimony, there was ample independent evidence otherwise introduced by the State which fully supported the guilty verdicts. Specifically, the Petitioner gave a statement to the police implicating himself in the crimes. Christopher Loyal's testimony also directly linked the Petitioner to the crimes. Furthermore, the Petitioner was arrested while wearing a gold necklace belonging to one of the victims and other items belonging to the victims and connected to the crimes were found in the Petitioner's apartment. The Petitioner, nevertheless, contends that Cartwright offered the only testimony supporting the jury's finding of premeditation. The Petitioner, however, ignores the fact that he was also convicted of the felony murders of the two victims, convictions which do not require a finding of premeditation.

Having reviewed the evidence at issue in light of the entire record on appeal, this Court is confident that, absent the disclosure of Cartwright's juvenile court file, the Petitioner received a fair trial. We agree with the trial court, therefore, that none of the evidence contained in Cartwright's juvenile court file actually undermined any of the other evidence introduced at trial.

27

(2) Murphy's videotaped statement:

Sometime prior to the beginning of the evidentiary hearing, the State discovered a videotaped statement of Yakou Murphy. Although the substance of the interview with the police related primarily to the investigation into this case, the videotape apparently was mistakenly placed in the file of another unrelated case. And although the trial court permitted the Petitioner to amend his *Brady* claim to include the suppression of this piece of evidence, the trial court did not address this evidence in its written order. The State argues that the issue is waived. However, it is clear from the record that the Petitioner properly amended his petition to include this evidence as part of his *Brady* claim. Despite the trial court's failure to address this particular claim, we are nevertheless required to conduct a purely *de novo* review to determine whether this piece of evidence was material to the defense as the Petitioner argues. *See Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004).

Murphy's trial testimony is summarized above. In the videotaped statement, Murphy said that on the day of the murders he heard the Petitioner and Berry engage in discussions about a gun deal or trade and that he later saw the Petitioner and Berry bring guns into the Petitioner's apartment. Murphy said that after the Petitioner and Berry brought the guns into the apartment there were quite a few people mingling about and talking to each. Murphy indicated to the police that the scene then was hectic and that he thus could not hear everything that was being said. Although he said that he did not hear anyone specifically state that anyone would have to be killed, Murphy indicated to the police that the Petitioner and Berry were part of the group that left the apartment later carrying guns. Murphy said he saw Berry and three other men in a Cadillac and that they appeared to be waiting on the Petitioner. Berry also told the police, however, that at some point during the night he rode with the Petitioner in a different car to another apartment. Murphy said that "they" did not stay at the Petitioner's apartment that night. Murphy denied knowing the victims or being present at the murder scene.

Koger testified that he was aware Murphy had given a statement to the police. Because Murphy was a defense witness, Koger testified that he would have been interviewed by the defense team prior to trial. And although Koger stated that the statement Murphy gave to the police could have been used to impeach Cartwright's testimony, he further stated that he would not have attempted to impeach his own witness.

Without commenting on whether the videotaped statement of Murphy was actually suppressed by the State, we conclude that the evidence was not material as that term applies under a *Brady* analysis. Again, materiality requires a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine

28

confidence in the verdict." *Kyles*, 514 U.S. at 435. This Court does not agree with the Petitioner's assessment that Murphy's videotaped statement contradicts the trial testimony of Cartwright and Murphy. The Petitioner argues otherwise that the statement could have been used to impeach both Cartwright's and Murphy's trial testimony. While that may be true, the fact remains that there was sufficient and independent evidence, as noted above in the discussion of the Cartwright material, to support the convictions. Having reviewed the videotaped statement of Murphy in light of the trial record, this Court is confident that the Petitioner received a fair trial absent its discovery.

(3) Martin evidence

At the time of the trial, the Petitioner's girlfriend, Dimitrice Martin, was alleged to have been involved in other serious criminal activity, including a robbery and murder. According to the Petitioner, despite his request, the State did not provide defense counsel with Martin's statements or testimony in her other criminal cases.

While noting that the Petitioner summarily concluded that the evidence is material without providing a basis for this assertion, the trial court concluded that this evidence was not material. On appeal, the Petitioner recognizes the fact that Martin acknowledged having had criminal charges pending against her at the time of her trial testimony in this case. The Petitioner asserts, however, that defense counsel could somehow have further impeached Martin based on her statements in those unrelated cases. This Court must disagree. The trial transcript reveals that Martin admitted to having criminal charges pending against her, including first degree murder, especially aggravated kidnapping and especially aggravated robbery. The Petitioner simply has not pointed to anything in the evidence at issue which undermines the confidence in the outcome of the trial. In other words, based upon our review, even if defense counsel had reviewed the statements and testimony of Martin in her unrelated cases, we conclude that there is no reasonable probability that the result of this trial would have been different.

Finally, the Petitioner argues that the Court must view the impeachment evidence relating to these three witnesses cumulatively. He contends the evidence, as a whole, completely changes the portrait of what occurred the night of the murders and bears directly on the Petitioner's role in the crimes, if any, and the credibility of Cartwright's testimony. This Court disagrees with the Petitioner's assessment of this evidence. None of the contested evidence is material, whether viewed independently or cumulatively. Throughout his argument on this issue, the Petitioner neglects to acknowledge the otherwise sufficient and independent evidence tying him to the crimes, including his own statement to the police. The trial court did not err in denying relief on the Petitioner's *Brady* claim.

II.     *Inconsistent Theories*

The Petitioner argues that the State pursued inconsistent theories during his and Berry's trials. The Petitioner contends that notions of due process and fundamental fairness demand a new trial because Cartwright's inconsistent testimony in the two trials likely affected their individual outcomes. As noted earlier, Cartwright testified during Berry's trial that Berry said the victims would have to be killed, while he testified at the Petitioner's trial that the Petitioner uttered those words.

The trial court, in denying post-conviction relief on this ground, made the following comments:

> [T]he testimony, if accredited, is essentially undisputed that Berry and Davis were in agreement to rob the two victims. The testimony and prosecution theories were essentially identical on the issue of the plan to commit robbery. Cartwright heard a conversation between these two men (Berry and Davis) that if they robbed the men they would have to kill them. No evidence indicated either party sought to abandon or abort any part of that plan. Because both men had conspired to commit the offenses (including the necessity to kill the men), both were equally culpable at that point. While these statements, along with the statements of others, varied as to the events leading up to the killings that night, the core of the prosecution's case was not inconsistent or constitutionally infirm.

The trial court also noted that the supreme court, during Berry's direct appeal, found that any inconsistency between Cartwright's testimony at the two trials was insignificant because both men were present and in apparent agreement when the statement was made. *Berry*, 141 S.W.3d at 554 n.5.

This Court was presented with this very issue in Berry's post-conviction appeal:

> Although our supreme court has recognized the possibility that pursuit of inconsistent theories at the separate trials of co-defendants may have due process implications, the court has steadfastly declined to adopt the rule of *Smith v. Groose,* 205 F.3d 1045 (8th Cir. 2000), that " 'core' inconsistencies violate Due Process guarantees." *State v. Housler,* 193 S.W.3d 476, 492 (Tenn. 2006); *see also State v. Robinson,* 146 S.W.3d 469, 496 n. 13 (Tenn. 2004). In both *Housler* and *Robinson,* the court found that the State had not actually presented inconsistent theories, making analysis of any due process issue unnecessary. We reach the same conclusion in this case.

30

The State's theory at the petitioner's trial was that the petitioner and co-defendant formulated a plan to steal guns and other belongings from Mr. Lee and Mr. Ewing and that their plan included murdering the victims to avoid retribution. This theory was the same at the trial of both the petitioner and the co-defendant. *See Berry,* 141 S.W.3d at 554; *State v. Davis,* 141 S.W.3d 600, 606 (Tenn. 2004). Regardless of which of the two actually uttered the statement that the victims would have to be killed, the proof clearly established that both men agreed to the scheme and set out together, armed with handguns, to fulfill their plan. *See Berry,* 141 S.W.3d at 554; *Davis,* 141 S.W.3d at 606. Whether guilty as the principal under a theory of criminal responsibility or as an equal participant in the co-defendant's plan, the petitioner was nevertheless guilty of the charged offenses.

*Berry*, 366 S.W.3d at 182-83. The Court holds the same in this case.

The Petitioner suggests that the issue is not *who* made the statement but *whether* it was even uttered at all. The Petitioner argues: "If the statement was never made, then there is no evidence of premeditation nor of one of the aggravating circumstances - that [the victims] were killed to prevent them from testifying." The Petitioner, however, presented no credible proof to support his suggestion that the statement was never made. Although the videotape of Murphy's interview with the police was not reviewed by counsel prior to trial, Murphy informed the police that he did not hear everything that was said in the apartment that night. By suggesting that the statement might not have been made, the Petitioner is, in essence, attempting to argue insufficiency of the convicting evidence, something which he cannot now do. The supreme court held on direct appeal that the evidence introduced at trial was sufficient to support the convictions. *Davis*, 141 S.W.3d at 611-12. In addition, the court found the evidence sufficient to support the (i)(6) aggravating circumstance. *Id.* at 618-19. Because the sufficiency of the evidence has previously been determined, it is not a proper claim for post-conviction relief. Tenn. Code Ann. § 40-30-106(h).

III.    *Confrontation Clause*

The Petitioner contends that the admission of the victims' autopsy reports as evidence at trial and Dr. Bruce Levy's corresponding trial testimony violated his constitutional rights under the Confrontation Clause. He also contends trial counsel were ineffective for not challenging the admission of this evidence on that same constitutional ground.

Prior to trial, the Petitioner moved the court to exclude Dr. Levy's testimony regarding the autopsies because he did not actually perform them. *Davis*, 141 S.W.3d at 629.

31

Although the two medical examiners who performed the autopsies and authored the corresponding reports were apparently unavailable to testify at trial, the trial court allowed their reports to be admitted under the Rules of Evidence and permitted Dr. Levy to testify as an expert witness, express his opinions in his field, and communicate to the jury that he relied upon the autopsy reports in forming his opinions. *Id.* On appeal, this Court concluded that the autopsy reports were admissible hearsay under Tennessee Rules of Evidence 803(6) and 803(8) and admissible as public documents pursuant to Tennessee Code Annotated section 38-7-110. *Id.* at 630. Accordingly, the Court determined that the trial court did not err in allowing Dr. Levy to testify about the reports. *Id.* The supreme court affirmed this Court's conclusions in this respect. *Id.* at 622.

Although his challenge to the admission of this evidence would thus appear to have been previously determined, Tennessee Code Annotated section 40-30-106(h), the Petitioner argues that the United States Supreme Court's opinions in *Crawford v. Washington*, 541 U.S. 36 (2004), and its progeny, *Melendez-Diaz v. Massachusetts*, 129 S.Ct. 2527 (2009) and *Bullcoming v. New Mexico*, 131 S.Ct. 2705 (2011), provide a constitutional basis for the exclusion of this evidence under the confrontation clause. In *Crawford*, the Supreme Court held that testimonial hearsay statements violate a defendant's rights under the Confrontation Clause and are only admissible when the declarant is both unavailable and there was a prior opportunity for cross-examination. *Id.* at 68. Hearsay is testimonial where it takes the form of "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* at 51. A statement is also considered testimonial if it is "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 51-52.

Interpreting the Supreme Court's decisions in *Melendez-Diaz* and *Bullcoming* in light of *Crawford*, this Court has recently held that autopsy reports may contain testimonial hearsay subject to the confrontation clause. *State v. James Drew Freeman, Jr.*, No. M2011-00184-CCA-R3-CD, 2012 WL 1656975 at *13 (Tenn. Crim. App., May 9, 2012), *perm. to appeal pending*, (Tenn. 2012). *See also State v. John Todd*, No. W2010-02640-CCA-R3-CD, 2012 WL 2150859 (Tenn. Crim. App., June 14, 2012). This Court recognized, however, that any erroneous admission of an autopsy report may be deemed harmless beyond a reasonable doubt. *Freeman*, 2012 WL 1656975 at *13 (citing *Coy v. Iowa*, 487 U.S. 1012, 1021 (1988) ("We have recognized that other types of violations of the Confrontation Clause are subject to that harmless-error analysis, *see e.g., Delaware v. Van Arsdall,* 475 U.S. [673, 679, 684 (1986)], and see no reason why denial of face-to-face confrontation should not be treated the same."). Similarly, the Court recognized that "the Confrontation Clause does not limit experts offering their own opinion regardless of the independent admissibility of the material relied upon." *Id.* at *14 (citing *Nardi v. Pepe*, 662 F.3d 107, 112 (1ˢᵗ Cir. 2011)). *See also*

*State v. Princeton Moody*, No. W2011-00376-CCA-R3-CD, 2012 WL 1080416 at *7-8 (Tenn. Crim. App., Mar. 30, 2012), *perm. to app. pending*, (Tenn. 2012).

The Petitioner argues that there was no other evidence, aside from the autopsy reports and Dr. Levy's testimony, showing the range at which the victims were shot and the number and effect of each shot. The Petitioner, however, does not contest the fact that the victims died as the result of homicidal acts. The issue at trial was not whether the victims were murdered but whether the Petitioner was involved. The autopsy reports and Dr. Levy's testimony did little to assist the jury in identifying the Petitioner or placing him at the scene of the crime; rather, the Petitioner did that himself in his statement to the police. Notwithstanding the evidence surrounding the autopsy reports, there was sufficient evidence otherwise establishing the Petitioner's guilt. Accordingly, we conclude that any alleged error in the admission of this evidence was harmless beyond a reasonable doubt. And despite the fact that the authority relied upon by the Petitioner in support of his argument on this issue was established after the conclusion of his trial and the briefing process on direct appeal to this Court, the Petitioner is otherwise unable to demonstrate any resulting prejudice regarding his claim of ineffective assistance of counsel in this respect. *See, infra.*

IV.     *Ineffective Assistance of Counsel*

The Petitioner claims he received the ineffective assistance of counsel during both the guilt and penalty stages of his trial. This Court will review in order each instance of misconduct alleged by the Petitioner in his brief on appeal.

The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This right to counsel is "'so fundamental and essential to a fair trial, and so, to due process of law, that it is made obligatory upon the States by the Fourteenth Amendment.'" *Gideon v. Wainwright*, 372 U.S. 335, 340 (1963) (quoting *Betts v. Brady*, 316 U.S. 455, 465 (1942)). Inherent in the right to counsel is the right to the effective assistance of counsel. *Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *see Combs v. Coyle*, 205 F.3d 269, 277 (6th Cir. 2000).

The United States Supreme Court has adopted a two-prong test to evaluate a claim of ineffectiveness:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687. The performance prong of the *Strickland* test requires a showing that counsel's representation fell below an objective standard of reasonableness, or "outside the wide range of professionally competent assistance." *Id.* at 690. "Judicial scrutiny of performance is highly deferential, and '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Combs*, 205 F.3d at 278 (quoting *Strickland*, 466 U.S. at 689).

Upon reviewing claims of ineffective assistance of counsel, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U .S. at 689. Additionally, courts should defer to trial strategy or tactical choices if they are informed ones based upon adequate preparation. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). Finally, we note that criminal defendants are not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 655 n. 38 (1984)). Notwithstanding, we recognize that "[o]ur duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." *Id.* at 785.

If the Petitioner shows that counsel's representation fell below a reasonable standard, then he must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In evaluating whether a petitioner satisfies the prejudice prong, a court must ask "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (citing *Strickland*, 466 U.S. at 687). In other words, a petitioner must establish that the deficiency of counsel was of such a degree that it deprived the defendant of a fair trial and called into question the reliability of the outcome.

*Nichols*, 90 S.W.3d at 587. That is, the evidence stemming from the failure to prepare a sound defense or to present witnesses must be significant, but it does not necessarily follow that the trial would have otherwise resulted in an acquittal. *State v. Zimmerman*, 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991). "A reasonable probability of being found guilty of a lesser charge, or a shorter sentence, satisfies the second prong in *Strickland*." *Id.* Moreover, when challenging a death sentence, a petitioner must show that "'there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death.'" *Henley*, 960 S.W.2d at 579-80 (quoting *Strickland*, 466 U.S. at 695).

A. Jury Selection

The Petitioner contends that trial counsel were ineffective during the jury selection process in the following ways: they failed to object to the trial court's use of an anonymous jury, they failed to object when the trial court excused prospective jurors based on their views on capital punishment, they failed to "life qualify" prospective jurors, they failed to "own" the bad evidence, and they permitted the Petitioner to participate in the selection of the jury.

In denying relief on this particular ground, the trial court recalled that prospective jurors were excused by the court only after it was satisfied that the jurors would not be able to follow the court's instructions on the applicable law, including the three available punishments. The court noted that the Petitioner did not suggest that any specific jurors were improperly excused, but instead complained that counsel were ineffective simply for failing to object to the process employed by the court during voir dire. The trial court also concluded that the Petitioner failed to demonstrate how the use of an anonymous jury prejudiced him or why counsel's failure to object resulted in deficient performance. The court noted that general concerns about the Petitioner's inability to fully examine a juror's background, connections and potential biases were not present in this case. The court again recognized that the Petitioner was simply challenging counsel's decision not to object without advancing any argument supporting a finding of deficient performance or prejudice. The court also recounted counsel's testimony approving of the use of the numbering system for the jurors.

During the evidentiary hearing, Koger testified that he did not see any problem with the trial court referring to the jurors by numbers rather than by their names. Instead, Koger thought the numbering system worked well in this case and he did not believe it negatively impacted the jury. Hornik testified similarly. Koger testified that he used a consultant during jury selection, but said he also took into account the Petitioner's input. Koger believed they selected a good jury. According to Koger, the focus during jury selection was to avoid

35

empaneling anyone who was obviously in favor of the death penalty. Koger testified that he did not and would not have referenced during jury selection the fact that the Petitioner had a prior first degree murder conviction, especially given the facts of the Dickerson case.

Koger stated that each prospective juror completed a questionnaire. And although counsel did not exhaust all of their peremptory challenges, Koger testified that counsel, the jury consultant, and the Petitioner all agreed that the jurors they ultimately selected were better than any other potential juror remaining in the pool. Koger believed that the jurors selected affirmed they would be able to consider all three possible punishments if the Petitioner was found guilty of first degree murder. Koger testified that each juror was questioned about their ability to vote for a life sentence. In fact, Koger testified that two potential jurors who stated that they were opposed to the death penalty were allowed to remain on the panel until other unrelated conflicts arose requiring their dismissal. Koger also recalled that the trial judge dismissed several jurors who stated they could not consider a life sentence for a first degree murder conviction.

The Petitioner has not demonstrated how trial counsel's tactical decisions during jury selection resulted in either deficient performance or prejudice. Although the Petitioner complains about counsel's actions, he fails to argue how he was actually prejudiced by them. As the trial court observed, the Petitioner does not claim that the process deprived him of crucial information about the jurors. Although the jurors were commonly referred to by numbers, the Petitioner actually knew their names and the jurors were aware of that fact. Moreover, trial counsel employed the services of a jury consultant, and both attorneys testified that they were pleased with the jury that was eventually selected. Counsel explained that they did not like to reference or emphasize unfavorable evidence during jury selection. Contrary to the Petitioner's argument on appeal, such trial strategy cannot be questioned. Finally, despite now disagreeing with trial counsel acquiescing to allow him to participate in the selection of the jury, the Petitioner does not explain how he was prejudiced by his own participation. The record simply does not support the Petitioner's argument regarding this ground for post-conviction relief.

B. Guilt Phase

The Petitioner contends that trial counsel were unqualified to handle the trial of this case, never established a working relationship with their client, failed to conduct an adequate guilt phase investigation, and were unprepared for trial. Both Koger and Hornik were appointed by the trial court to represent the Petitioner and both testified that at that time they were qualified under the applicable supreme court standards to handle a death penalty trial. The Petitioner's meager allegation that they "lacked basic procedural knowledge essential to the defense of a capital case," without any supporting argument or citation to relevant

36

authority, fails to establish any ineffectiveness on the part of counsel based on their professional experience.

Similarly, the Petitioner's contention that trial counsel failed to develop a working relationship with him is unfounded. The Petitioner did not testify at the evidentiary hearing. Despite his complaint on appeal, both attorneys testified to the contrary. Koger testified that, although he did not maintain regular contact with the Petitioner in person because of geographical difficulties, he testified otherwise about the numerous communications he had with his client. Further, he testified that the Petitioner was a bright individual who insisted on being actively involved in the defense of his case. According to Koger, he got along well with the Petitioner and never experienced any difficulty communicating with the Petitioner about any aspect of the case. Hornik testified similarly. Counsel's testimony that the Petitioner was actively involved in almost every aspect of his own defense, in and of itself, belies his own argument. The record simply does not support the Petitioner's bare allegation that counsel failed to develop a meaningful working relationship with the Petitioner.

According to the Petitioner, counsel's inadequate investigation into the guilt phase of the trial left them uninformed about potential defenses or weaknesses in the State's case. Both attorneys testified about the extent of their pretrial preparation. According to Koger, the defense team consisted of, in addition to the three attorneys, six investigators, a jury consultant, and two expert witnesses. Koger billed a total of 1,436 hours of work on this case, and he testified that he did not bill for another approximately ten to twenty percent of his time. Although Hornik's time sheets were stolen, he testified that he performed some work on this case every day between the time of his appointment and trial. Moreover, Hackenmiller acknowledged that the investigators conducted an extended and intensive investigation in this case. In fact, the investigators employed by defense counsel billed over 600 hours of work on this case. Based on this evidence alone, the Petitioner's suggestion that counsel conducted "little or no investigation" into his case is baseless.

Defense counsel were given complete access (the Petitioner's *Brady* claim is discussed above) to the State's files and thus knew the facts of the case. Both attorneys testified that the goal of the defense was to create a reasonable doubt in the jury's mind. Koger admitted that the State's case was strong. Counsel moved, unsuccessfully, to suppress the Petitioner's statement to the police. Thus, counsel knew the statement was going to be shown to the jury. Hornik testified, though, that he did not want to emphasize that fact to the jury during opening statements. Counsel also had the Petitioner evaluated prior to trial, but the results did not favor a mental health defense. Counsel were hopeful, however, that the jury's knowledge of the Petitioner's hospitalization and weakened physical condition resulting from the spider bite would lend support to an impaired capacity argument.

Counsel were moving forward with what they considered their best defense despite the fact that the Petitioner informed them at the very beginning that he intended to testify in his own defense. The trial record reflects that before the Petitioner took the stand counsel informed the trial court that the Petitioner was doing so against the strenuous objections of counsel. It is evident from the post-conviction testimony of counsel that they were completely flabbergasted by the Petitioner's trial testimony. Although counsel intimated that they had a difficult case to defend, they both testified that all of their efforts in creating any sort of reasonable doubt up to that point were basically wasted following the Petitioner's testimony. The Petitioner testified during direct examination by his attorneys, and again on cross, that he smoked marijuana and was feeling just fine the night of the crimes. The Petitioner gave a different account of the events surrounding the crimes and testified that his statement to the police was just "one big lie." Counsel testified, therefore, that in order to save any remaining credibility for the Petitioner, they could not introduce any witnesses who would discredit the Petitioner's own testimony. In essence, according to Hornik, the Petitioner dug his own hole: "I will be very frank with you. [The Petitioner's] testimony in his own defense was the one greatest single item of proof that the State had to convict [him]."

Based upon this Court's review of the record, we cannot conclude that trial counsel's performance was deficient in this respect. Despite the Petitioner's argument to the contrary, the record clearly demonstrates to us that counsel engaged in extensive investigation and pretrial preparation. Counsel admitted, and the record reflects, that they faced an uphill battle in defending this case. Nevertheless, the defense proposed by counsel was developed following adequate preparation, and this Court will, therefore, defer to counsel's trial strategy in that respect. And although both attorneys acknowledged that the Petitioner was very involved in his own defense, they both also testified that the Petitioner refused to inform them what he planned on telling the jury. Accordingly, counsel were required to formulate a trial strategy without knowing what effect the Petitioner's own testimony would have on their case.

Koger testified that he "was upset with [the Petitioner's] testimony more so than I had ever been before or since with any witness that I have ever had." Koger stated that he "hate[ed] to be the last person in the room that knows what is going to happen at trial" but the Petitioner simply told him not to worry. Both attorneys testified that the Petitioner's testimony effectively rendered their trial strategy worthless. According to Koger, the Petitioner's testimony "gutted" any "headway" they made with the jury, and Hornik said the Petitioner basically "torpedoed" counsel's efforts. The Petitioner did not testify at the evidentiary hearing. Trial counsel's testimony is summarized above. The overriding theme was that, despite the Petitioner's active role in the defense of the charges against him, counsel were essentially handcuffed by the Petitioner's own actions. "'The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own

statements or actions,' and 'what investigation decisions are reasonable depends critically on such information.'" *Felts v. State*, 354 S.W.3d 266, 277 (Tenn. 2011) (quoting *Strickland*, 466 U.S. at 691).

Although the Petitioner argues elsewhere that counsel was not provided with some of the information related to Cartwright and Murphy, the Petitioner asserts nonetheless that counsel should have more thoroughly investigated the background of these witnesses. As this Court has observed, "the 'materiality' aspect of a *Brady* claim is governed by the same prejudice standard as an ineffective assistance of counsel claim; that is, a defendant must show that there is a reasonable probability that the result of the proceedings would have been different." *Cauthern*, 145 S.W.3d at 598-99 (citing *Bagley*, 473 U.S. at 682). We have already concluded that the Petitioner received a fair trial despite counsel's failure to discover Cartwright's juvenile court file or Murphy's videotaped statement to the police. Despite his argument regarding counsel's investigation in this respect, the same must be said here.

Although the Petitioner contends the alleged shortcomings in counsel's performance undermined the confidence that the guilty verdicts were reliable, he neglects to demonstrate how they were unreliable. Nevertheless, the record does not reveal any resulting prejudice. In order to establish prejudice, the Petitioner is required to show that the deficient representation was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome. *Nichols*, 90 S.W.3d at 587. Again, as stated previously, the Petitioner admitted his involvement in the crimes. Counsel attempted to suppress the Petitioner's statements, but they were unsuccessful. The Petitioner, however, does not complain about that motion filed by counsel. In addition, counsel attempted to persuade the Petitioner not to testify, or at a minimum, to at least inform counsel what he intended to tell the jury. They were unsuccessful in that regard as well. Based upon the convicting evidence, including the Petitioner's own statements and the items found in the Petitioner's bedroom, the Court cannot find any resulting prejudice.

The Petitioner is not entitled to perfect representation by trial counsel, only that which is constitutionally required, and following our consideration of this ground for post-conviction relief, we conclude that trial counsel provided what was constitutionally required in their investigation of the case and the presentation of a defense during the guilt phase of the trial.

C.     Sentencing Phase

The Petitioner also argues that trial counsel were ineffective in their investigation and presentation of mitigating evidence during the penalty phase of the trial. The Petitioner suggests that trial counsel's failure to adequately investigate his background, family life,

childhood development, or potential for addiction resulted in the presentation of a weak mitigating defense to the aggravating circumstances. The Petitioner focuses on counsel's decision not to call expert witnesses and counsel's inability to convey to the jury that the Petitioner was raised in a highly dysfunctional setting.

Contrary to the Petitioner's suggestion otherwise, the record clearly demonstrates that trial counsel conducted a thorough investigation into the Petitioner's background. The amount of time counsel and the investigation team spent working on this case is accounted above. Regarding Dr. Auble and Dr. Smith, the Petitioner contends that the decision to forego calling these two experts to testify during sentencing was not the result of an informed strategic choice but rather of counsel's failure to effectively prepare for and present the defense case for mitigation. This Court must disagree.

Koger testified that the theory of mitigation was that the Petitioner had a troubled and unstable background. Koger hoped the jury would have some compassion for the Petitioner after hearing the Petitioner's father testify, but Koger stated the father was an ineffective witness for them. Koger wanted the jury to learn how bad of a person the father was, but according to Koger, the father instead tried to paint a better picture of himself in front of the jury. Koger acknowledged that he did not talk to the Petitioner's father before trial. Although Koger said they obtained the Petitioner's school records, they did not offer them into evidence during sentencing. According to Koger, he was satisfied with the Petitioner's mother's ability to convey to the jury the extent of the Petitioner's troubled childhood. In addition, several other witnesses testified about the Petitioner's background. Although the mitigation specialists prepared visual aids for trial, including charts and graphs detailing time-lines and the various personal relationships of the Petitioner's life, Koger testified that he did not like to show those types of demonstrative displays to juries. Instead, he prefered to solicit the information verbally from the witnesses. In addition, he testified that he made a tactical decision not to use the visual aids in order to save credibility with the jury.

Koger testified that sometimes mitigating evidence which initially seemed beneficial could end up negatively impacting the jury and, therefore, counsel took this into account when deciding which evidence to introduce in order to attempt to humanize the Petitioner in front of the jury. Koger also testified that they tried to avoid introducing any cumulative evidence. When asked why he did not call the Petitioner's former principal to testify about how the Petitioner's parents' drug use and his father's incarceration affected him, Koger testified that other witnesses conveyed that information to the jury, including the Petitioner's mother, who Koger thought was very effective. Koger did not believe it would have been effective to introduce photographs depicting the Petitioner in happier times because they could have discredited any evidence the defense presented that the Petitioner was the product of a troubled childhood. Koger also did not place much emphasis on the fact that the

40

Petitioner earned his GED while in prison or was willing to participate in a drug and alcohol rehabilitation program. Koger stated that they were not focused in mitigation on showing that the Petitioner had the capacity for rehabilitation.

The Petitioner argues on appeal that trial counsel did an inadequate job explaining to the jury the true nature and extent of the Petitioner's troubled background. The record simply does not support the Petitioner's argument. The jury was informed that the Petitioner's parents used and sold drugs in front of the children, that the Petitioner spent a great deal of time with his grandmother because of his parent's illicit lifestyle, and that the Petitioner himself started using and selling drugs at an early age.

Trial counsel both testified that after the Petitioner testified during the guilt phase they were forced to retain as much credibility with the jury as possible during sentencing. Following the Petitioner's trial testimony, counsel met with the experts and ultimately decided not to call them as mitigation witnesses. Both attorneys believed that after the Petitioner's testimony, Dr. Auble's diagnosis of anti-social personality disorder would not have been received well by the jury. Counsel were concerned that any positive aspects of Dr. Auble's diagnosis would have been outweighed by the negative characteristics associated with anti-social personality, especially deceitfulness and lack of remorse. Counsel thus decided they could not risk calling Dr. Auble as a witness and lose further credibility with the jury after the Petitioner testified. Similarly, because counsel believed the Petitioner's testimony would have been contradictory to Dr. Smith's testimony, counsel decided not to call Dr. Smith only to have his testimony discredited.

Although counsel were prepared to present expert testimony, they both testified that the Petitioner's own conduct prevented them from pursuing a course of action which they believed would have been more detrimental to the defense by losing credibility with the jury. Counsel admitted they had a difficult case to defend and they stated that maintaining credibility with the jury was essential during sentencing. Accordingly, they focused on presenting evidence describing the Petitioner's troubled background.

The trial court concluded that trial counsel were not deficient for failing to call Drs. Auble and Smith as witnesses. This Court agrees. The petitioner is basically challenging counsel's trial strategy. However, reviewing courts must indulge a strong presumption that the conduct of trial counsel falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689. Our supreme court has stated:

> "Hindsight can always be utilized by those not in the fray so as to cast doubt on trial tactics a lawyer has used. Trial counsel's strategy will vary even among the most skilled lawyers. When that judgment exercised turns out to

41

> be wrong or even poorly advised, this fact alone cannot support a belated claim
> of ineffective counsel."

*Hellard*, 629 S.W.2d at 9 (quoting *Robinson v. United States*, 448 F.2d 1255, 1256 (8ᵗʰ Cir. 1971)). "It cannot be said that incompetent representation has occurred merely because other lawyers, judging from hindsight, could have made a better choice of tactics." *Id.* This Court must defer to counsel's trial strategy and tactical choices when they are informed ones based upon adequate preparation. *Id.* The record in this case demonstrates that they were.

During the evidentiary hearing, the Petitioner introduced evidence through Dr. Van Eys and Dr. William Kenner (via affidavit) which described how exposure to abuse and neglect could impact the developing brain of a child. The Petitioner argues that counsel should have considered introducing similar evidence as mitigation at trial. While the trial court agreed that this information could have been presented to the jury, the court concluded that counsel's failure to do so did not constitute deficient performance. We agree with the trial court's conclusion that counsel were not deficient in this respect.

As noted earlier, criminal defendants are not entitled to perfect representation, only constitutionally adequate representation. *Denton*, 945 S.W.2d at 796. "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Moreover, "an accused is not deprived of the effective assistance of counsel because a different procedure or strategy might have produced a different result." *Vermilye v. State*, 754 S.W.2d 82, 85 (Tenn. Crim. App. 1987).

This is not a case where trial counsel failed to conduct any background investigation or introduce any evidence in mitigation. Instead, trial counsel thoroughly investigated the Petitioner's background, presented evidence of the Petitioner's dysfunctional childhood through lay witnesses, and were prepared to call two expert witnesses in mitigation. *See Goad v. State*, 938 S.W.2d 363, 369-70 (Tenn. 1996) ("although there is no requirement that defense counsel present mitigating evidence in the penalty phase of a capital trial, counsel's duty to investigate and prepare for a capital trial encompasses both the guilt and sentencing phases"). We have already concluded that counsel's decision not to call those experts was not deficient. The fact that the Petitioner formulated a somewhat alternate theory during the evidentiary hearing, however, does not equate with the ineffective assistance of counsel at trial.

The Petitioner also contends that counsel failed to present effective opening and closing argument during the penalty phase. The Petitioner, however, does not argue how counsel's statements to the jury were prejudicial. He simply states that counsel's argument

42

was ineffective. The trial court found this ground without merit, and our independent review of the record supports this finding.

D.      Appeal

Finally, the Petitioner argues counsel rendered ineffective assistance on direct appeal. The Petitioner lists several issues and advances a general claim that counsel were ineffective for failing to include them in their brief on appeal. However, as the trial court noted, the Petitioner did not question counsel during the evidentiary hearing about their choice of issues raised on appeal. Thus, counsel was unable to explain or defend their appellate strategy. As the record reflects, counsel raised a total of sixteen issues on appeal to this Court challenging both his convictions and sentence.

The "failure to preserve and/or assert all arguable issues on appeal is not *per se* ineffective assistance of counsel, since the failure to do so may be a part of the counsel's strategy of defense." *State v. Swanson*, 680 S.W.2d 487, 491 (Tenn. Crim. App. 1984). Moreover, "[c]ounsel is not constitutionally required to argue every issue on appeal, or to present issues chosen by his client." *Id.* Indeed, "[t]he determination of which issues to present on appeal is a matter of counsel's discretion." *Id.* "Ineffectiveness is very rarely found in cases where a defendant asserts that appellate counsel failed to raise an issue on direct appeal, primarily because the decision of what issues to raise is one of the most important strategic decisions to be made by appellate counsel." *Kennath Henderson v. State,* No. W2003-01545-CCA-R3-PD, 2005 WL 1541855 at *44 (Tenn. Crim. App., June 28, 2005), *perm. to app. denied*, (Tenn., Dec. 5, 2005).

> A petitioner alleging ineffective assistance of appellate counsel must prove both that (1) appellate counsel acted objectively unreasonably in failing to raise a particular issue on appeal, and (2) absent counsel's deficient performance, there was a reasonable probability that defendant's appeal would have been successful before the state's highest court. To show that counsel was deficient for failing to raise an issue on direct appeal, the reviewing court must determine the merits of the issue. Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it. Likewise, unless the omitted issue has some merit, the petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal. When an omitted issue is without merit, the petitioner cannot prevail on an ineffective assistance of counsel claim.

*Id.* (internal citations omitted).

The Petitioner has not presented any meritorious issue which counsel failed to but should have raised on direct appeal. The Petitioner has simply failed to carry his burden of proof on this particular claim of ineffective assistance of counsel.

V.      *Jury Related Issues*

The Petitioner advances several arguments regarding the selection of and instructions to the jury. He argues that the trial court violated his constitutional rights by empaneling an anonymous jury, by dismissing or failing to dismiss certain jurors, and by giving improper instructions to the jury.

A. Jury Selection

The Petitioner did not challenge on direct appeal the trial court's reference to individual jurors by numbers or the trial court's questioning of jurors during voir dire. Accordingly, these grounds for post-conviction relief must be considered waived.

> A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless:
>
> (1) The claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right; or
>
> (2) The failure to present the ground was the result of state action in violation of the federal or state constitution.

Tenn. Code Ann. § 40-30-106(g).

In addition to arguing that the trial court violated his rights, the Petitioner argues again under the heading of this issue that his trial attorneys were ineffective for failing to challenge the trial court's actions in this respect. We have already concluded, however, that trial counsel were not ineffective during jury selection.

B. Instructions.

The Petitioner argues that the trial court's instructions on intent, criminal responsibility, and felony murder were unconstitutional. He also contends that the court's instruction during sentencing, that the jury should not allow sympathy to affect its verdict,

44

was not constitutionally accurate. Again, however, because these claims for relief were not raised on direct appeal, they have been waived. *Id.*

The Petitioner suggests, in the alternative, that trial counsel's failure to object to the trial court's instructions to the jury constituted ineffective assistance of counsel. The Petitioner, however, does not offer any specific argument in support thereof. *See* Tenn. R. Crim. P. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). The Petitioner asserts simply that "the failure to object to these instructions also constitutes ineffective assistance of counsel." The Petitioner cannot save waiver of the jury instructions issue by couching the claim in terms of ineffective assistance without offering a specific argument about how counsel's actions were deficient. Nevertheless, the Petitioner has failed to demonstrate any resulting prejudice.

Despite waiver, the trial court addressed the merits of the Petitioner's claim regarding the jury instructions. Citing *State v. Rogers*, 188 S.W.3d 593 (Tenn. 2006), the court concluded that the jury instruction on intent for premeditated first degree murder was proper. The Petitioner acknowledges the holding in *Rogers*, but he argues that it is inapplicable in this case because the jury was also charged on the theory of criminal responsibility. According to the Petitioner's argument, when read together, the intent and criminal responsibility instructions were unintelligible. The trial court disagreed, concluding that the criminal responsibility instruction did not reduce the State's burden of proof or permit the jury to ignore the requisite finding of intent for premeditated first degree murder. We agree with the trial court. Contrary to the Petitioner's argument, when read as a whole, the instructions on intent and criminal responsibility in this case fairly submitted the legal issues without misleading the jury as to the applicable law. *See State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005). The instructions did not misstate any element of the offenses, but instead instructed the jury on all of the applicable statutory requirements. As such, any alleged confusion in the instructions did not rise to the level of constitutional error. *Id.* at 60. *See* Tenn. Code Ann. § 40-30-103 ("Relief under this part shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States.").

Similarly, the Petitioner suggests that the instructions on felony murder and criminal responsibility, when read together, eliminated the underlying mens rea the jury was required to find. Following our review of the instructions given to the jury on felony murder and criminal responsibility, both of which mirrored the Tennessee Pattern Jury Instructions, we conclude that trial counsel were not ineffective for failing to object. The plain language of the jury instructions refutes the Petitioner's argument. The jury was specifically instructed that "the intent to commit the underlying felony must exist prior to or concurrent with the

45

commission of the act causing the death of the victim." The jury was also instructed on the definition of "intent" and "knowing." When read as a whole, the felony murder instruction fairly submitted the legal issues without misleading the jury as to the applicable law. *See Faulkner*, 154 S.W.3d at 58. Nor were counsel ineffective for failing to object to the trial court's instruction that the jury could "have no prejudice, or sympathy, or allow anything but the law and the evidence to have any influence on [its] verdict." *See, e.g.*, *State v. Keen*, 926 S.W.2d 727, 739 (Tenn. 1994) (holding such an instruction to be proper).

## VI. *Prosecutorial Misconduct*

The Petitioner argues that he should be granted a new sentencing hearing due to the alleged misconduct of the prosecutor. Specifically, the Petitioner contends the prosecutor made improper comments to the jury about the importance of mitigation during voir dire and closing argument at the penalty phase and inappropriately referenced the Petitioner's alleged gang affiliation as a non-statutory aggravating circumstance.

To the extent the Petitioner is challenging the actions of the prosecutor during trial, this ground for post-conviction relief has been waived due to the Petitioner's failure to raise the issue earlier. Tenn. Code Ann. § 40-30-106(g). The Petitioner's argument in his appellate brief on this issue focuses on the actions of the State. However, as he did in the jury related issues discussed above, the Petitioner has included a footnote at the beginning of the argument section in his brief which reads simply: "Trial counsel's failure to object to this conduct also constitutes ineffective assistance of counsel." Again, the Petitioner cannot save waiver of this issue by couching the claim in terms of ineffective assistance without offering a specific argument about how counsel's actions were deficient. *See* Tenn. R. Crim. P. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Nevertheless, because the trial court correctly instructed the jury, the Petitioner has failed to demonstrate any resulting prejudice. *See State v. Jordan*, 325 S.W.3d 1, 60 (Tenn. 2010) (finding harmless error in alleged improper remarks by prosecutor to jury about their duty during sentencing because any misstatements sufficiently corrected by trial court's instructions on law).

## VII. *Conflict of Interest*

The Petitioner contends he should be granted a new trial due to trial counsel's ongoing conflict of interest. This issue was presented for review on direct appeal. The supreme court ruled accordingly:

> Davis argues that the trial court erred in denying a motion to withdraw filed by defense counsel. The State maintains that review of the issue has been waived

for failure to preserve the issue in the record on appeal.

The record indicates that Davis's attorneys filed a motion to withdraw prior to trial. At an evidentiary hearing on the motion, defense counsel asserted that they were unable to disclose the basis of their motion due to professional obligations, the attorney-client privilege, and other ethical considerations. The motion to withdraw was transferred to a different trial court, which denied the motion after an ex parte hearing and placed the order and the transcript of the hearing under seal. [Footnote: Although the trial court granted an interlocutory appeal, the Court of Criminal Appeals denied interlocutory review because defense counsel refused to consent to the unsealing of the trial court's order and the transcript of the hearing. *See* Tenn. R.App. P. 9(c).] On appeal, the Court of Criminal Appeals held that review of the issue was waived based on defense counsel's refusal to have the trial court's order and transcript unsealed.

In this Court, the position of defense counsel remains the same, i.e., that ethical and professional considerations prevent the unsealing of the trial court's order and the transcript of the ex parte hearing. Moreover, the brief asserts that the issue has been raised for the purpose of preserving it for further review. Under these circumstances, we conclude that the defendant is entitled to no relief on this issue. [Footnote: Davis has filed a pro se supplemental brief alleging that there is a conflict of interest in that his counsel are intentionally waiving this issue and arguing that the order and transcript must be unsealed. We have recognized, however, that a defendant in a criminal case may not proceed pro se while simultaneously being represented by counsel. *See Wallace v. State,* 121 S.W.3d 652, 655 n. 2 (Tenn. 2003). Accordingly, Davis's contentions cannot be reviewed in this appeal and must await the appropriate proceedings.]

*Davis*, 141 S.W.3d at 615.

Nimmo and Koger filed the motion to withdraw. Nimmo was later allowed to withdraw on different grounds. Koger continued to represent the Petitioner, while Hornik was appointed in place of Nimmo. When questioned about the matter during the post-conviction evidentiary hearing, Koger testified that he believed his ethical obligations continued to prevent him from discussing the matter further, despite the fact that the Petitioner had alleged ineffective assistance of counsel on his part.

The Petitioner must establish the factual allegations contained in his petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(2)(f). The Petitioner did not testify at the evidentiary hearing. To the extent he knows the basis of the conflict, he apparently has decided not to provide any information on the matter. The sealed record of the ex parte hearing on counsel's motion to withdraw was not included in the record on direct appeal. Furthermore, the Petitioner did not include that sealed record as part of the instant post-conviction record. The trial court apparently did not review the sealed record, ruling that "[w]ithout more the Court finds no basis to find ineffective assistance of counsel."

The Petitioner complains that no court has reviewed the sealed record to determine whether counsel's motion to withdraw was properly denied. The Petitioner, however, neglected to create an adequate record at the post-conviction hearing on this issue. Accordingly, this Court must conclude that he has failed to support his claim by clear and convincing evidence. *Id.*

The Petitioner suggests that he was somehow prejudiced because, following the denial of the motion to withdraw, counsel could not continue to effectively represent him throughout the remainder of the trial. Contrary to the Petitioner's argument, however, trial counsel indicated, and the record otherwise reflects, that the alleged conflict did not prevent counsel from zealously defending the charges against their client. The Petitioner has been afforded the opportunity during this post-conviction proceeding to demonstrate how he believed counsel's representation fell below an objective standard of reasonableness which prejudiced the outcome of the trial. Having considered his allegations on that issue, however, both this Court and the trial court have concluded that counsel were not ineffective. The Petitioner is not entitled to post-conviction relief on this claim.

VIII. *Death Penalty Challenges*

A. Aggravating Circumstances

The Petitioner contends that the State's (1) failure to charge the aggravating circumstances in the indictment and (2) its use of a previous conviction for an offense committed after the crimes in this case to support the prior violent felony aggravator violated his constitutional rights. As to the former, the issue was raised and addressed on direct appeal and thus has been previously determined. Tenn. Code Ann. § 40-30-106(h); 141 S.W.3d at 616. As to the latter, the issue must be deemed waived because the Petitioner failed to raise it on direct appeal. Tenn. Code Ann. § 40-30-106(g). Nevertheless, the Petitioner concedes that his *ex post facto* claim has been rejected by our supreme court. *See State v. Caldwell*, 671 S.W.2d 459, 465 (Tenn. 1984). The Petitioner, however, requests that the issue be further considered. This Court is bound by the decisions of our supreme court

and must, therefore, decline that request. *See State v. Jefferson*, 938 S.W.2d 1, 21 (Tenn. Crim. App. 1996). Furthermore, given the authority cited herein, the Petitioner's blanket claim that counsel was ineffective for failing to raise the *ex post facto* issue is without merit.

### B. Prosecutorial Discretion

The Petitioner argues that his death sentence was unconstitutionally imposed because of the prosecutor's discretion in seeking the same. This claim must be deemed waived because the Petitioner failed to raise it on direct appeal. Tenn. Code Ann. § 40-30-106(g). Nevertheless, the same is otherwise without merit. *See State v. Hester*, 324 S.W.3d 1, 18-19 (Tenn. 2010) ("we have found that the application of the death penalty in Tennessee is not rendered unconstitutional solely because locally elected District Attorneys General make discretionary charging decisions within a statutory framework established by the Tennessee General Assembly").

### C. Appellate Review

The Petitioner next contends that the proportionality review conducted by the appellate courts in his case violated his due process rights because no standards guided the courts' determination that the sentence imposed was proportionate to the sentences imposed in similar cases. Citing Tennessee Code Annotated Section 39-13-206, the supreme court conducted an appropriate proportionality review on direct appeal in this case. *Davis*, 141 S.W.3d at 619-622. The Petitioner's general claim regarding proportionality review has otherwise been rejected by our supreme court. *Hester*, 324 S.W.3d at 78-79. Moreover, our supreme court has held that, while important as an additional safeguard against arbitrary or capricious sentencing, comparative proportionality review is not constitutionally required. *See State v. Bland,* 958 S.W.2d 651, 663-64 (Tenn. 1997).

### D. Method of Execution

The Petitioner argues that Tennessee's lethal injection protocol and its use of the electric chair are cruel and unusual punishment. These arguments have been rejected by our supreme court. *See Hester*, 324 S.W.3d at 79-80 (lethal injection); *State v. Black*, 815 S.W.2d 166, 179 (Tenn. 1991) (electric chair).

## IX. *Non-Capital Convictions*

The Petitioner advances a general, unsupported claim that he is entitled to a new trial on his convictions for aggravated kidnapping and especially aggravated robbery based upon the errors alleged in his petition. Despite the fact that he did not further develop this claim

in his brief or support it with any substantive argument, this Court has already concluded that the Petitioner is not entitled to post-conviction relief in the form of a new trial on his first degree murder convictions. Furthermore, on direct appeal, the supreme court concluded that the evidence was sufficient to sustain these convictions. *Davis*, 141 S.W.3d at 612. The Petitioner is not entitled to relief on this claim.

## X.    *Issues Not Briefed*

Finally, the Petitioner states that he "incorporates by reference to the full extent as if copied herein verbatim each and every claim asserted in his original pro se post-conviction petition filed August 10, 2005, and relies on the evidence otherwise presented." This statement, however, does not save waiver of any issue not specifically raised and argued by the Petitioner in his brief on appeal. *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b).

## XI.    *Invalid Aggravating Circumstance*

The State argues that the trial court erred in granting the Petitioner a new sentencing hearing. As mentioned earlier, the jury sentenced the Petitioner to death based upon its finding of three aggravating circumstances: (1) the Petitioner was previously convicted of one or more felonies whose statutory elements involve the use of violence to the person; (2) the murders were committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the Petitioner; and (3) the murders were knowingly committed, solicited, directed, or aided by the Petitioner while he had a substantial role in committing or attempting to commit a robbery or kidnapping. Tenn. Code Ann. § 39–13–204(i)(2), (6) and (7) (2003). In proving the prior violent felony aggravator, the State introduced evidence that the Petitioner had previously been convicted of first degree murder and attempted second degree murder. The Petitioner's prior conviction for first degree murder has since been vacated, however.

The Petitioner and Berry were both convicted of the 1995 murder of 12-year-old Adrian Dickerson in Nashville. The State relied, in part, upon these first degree murder convictions in support of the prior violent felony aggravator in the trials for the Ewing and Lee murders. During separate post-conviction actions relating to the Dickerson murder, the State acknowledged that one of its primary witnesses, who testified that he witnessed the shooting of Dickerson, was actually incarcerated at the time of the crime and thus offered perjured testimony during trial. The State thus conceded that the Petitioner's and Berry's convictions for the first degree murder of Dickerson should be vacated. Consequently, the trial court granted both the Petitioner and Berry post-conviction relief in the Dickerson case.

The trial court stated that "the mere reference to another first degree murder, by its very nature, likely left a lasting impression on the jury at sentencing." The court ultimately concluded that the jury's consideration of the invalid conviction for first degree murder was not harmless:

> It is highly likely the first degree murder conviction had a significant effect on the jury's sentencing decisions. One could argue that the prior violent felonies also played a significant role in establishing the aggravating circumstance. Beyond the role these prior violent felonies played in first establishing existence of the prior violent felony aggravating circumstance is the importance the circumstance (without the prior first degree murder conviction) played in the jury's weighing process and its decision as to whether to impose the death penalty. . . . [I]t is difficult to know whether the jury would have determined that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt without the prior murder conviction.

When an invalid aggravating factor was used to support the imposition of the death penalty, reviewing courts must determine whether its erroneous use was harmless beyond a reasonable doubt when one or more valid aggravating circumstances remain. *Howell v. State*, 868 S.W.2d 238, 259-61 (Tenn. 1993). In *Howell*, our supreme court held:

> In order to guarantee the precision that individualized sentencing considerations demand and provide a principled explanation for our conclusion in each case, it is important, when conducting harmless error review, to completely examine the record for the presence of factors which potentially influence the sentence ultimately imposed. These include, but are not limited to, the number and strength of remaining valid aggravating circumstances, the prosecutor's argument at sentencing, the evidence admitted to establish the invalid aggravator, and the nature, quality and strength of mitigating evidence.

*Id.* at 260-61.

Contrary to the State's argument, the record reflects that the trial court conducted an appropriate harmless error analysis. Citing *Howell*, the trial court in this case made the following comments:

> Even if this Court applies the harmless error analysis and finds that two aggravating circumstances remain; that the prior violent felony aggravating circumstance is supported by a conviction for attempted second degree murder; that the prosecution may not have overly emphasized the first degree murder

51

conviction in its argument; that it has evaluated the strength of the mitigating evidence; and that the evidence introduced about the first degree murder conviction was minimal, the Court nonetheless is faced with the same concerns as the *Teague* court, to-wit: the petitioner's jury here heard that he had been previously convicted of first degree murder. Surely if informing the *Teague* jury that the defendant had been convicted of being accessory before the fact to second degree murder, how much more significant it must be that the [Petitioner's] jury was told of his first degree murder conviction in 1999.

In *Teague v. State*, the petitioner had been sentenced to death based upon the prior violent felony and avoidance of arrest aggravating circumstances, two of the same relied upon in the instant case. 772 S.W.2d 915, 929 (Tenn. Crim. App. 1988), *overruled on other grounds by State v. Mixon*, 983 S.W.2d 661, 671 n.13 (Tenn. 1999). The prior violent felony conviction in *Teague* which was later overturned was for being an accessory before the fact to second degree murder. *Id.* at 930. Concluding that the juror's reliance on the invalid circumstance was not harmless beyond a reasonable doubt, this Court observed that "[i]t is common knowledge that the admissions of other criminal offenses has a devastating effect upon juries. This is especially true in this case because the offense involved being an accessory to another murder." *Id.* at 932.

In *Howell*, our supreme court recognized that "the qualitative nature of each circumstance, its substance and persuasiveness" is "even more crucial" to harmless error analysis "than the sum of the remaining aggravating circumstances." *Id.* at 261. The court observed that, "[b]y their very nature, and under the proof in certain cases . . . some aggravating circumstances may be more qualitatively persuasive and objectively reliable than others" and that "the effect of the aggravating circumstance on the sentence may increase where there is proof of more than one prior violent felony conviction." *Id.* As this Court opined in Berry's post-conviction appeal, a prior first degree murder conviction is more "qualitatively persuasive and objectively reliable" than other aggravating factors because "it confirms, via the power of a conviction certified by the State, an accused's propensity to kill." *Berry*, 366 S.W.3d at 185 (citing *State v. Boyd*, 959 S.W.2d 557 (Tenn. 1998) and *Teague, supra*).

Based upon our review, we conclude that the record fully supports the trial court's conclusion that the jury's consideration of the prior invalid conviction for first degree murder was not harmless beyond a reasonable doubt. Although the State's proof supported the three aggravating circumstances even without the benefit of the invalid first degree murder conviction, the impact of that conviction on the jury cannot be ignored. Indeed, in the Petitioner's direct appeal, our supreme court emphasized that his "conviction for a prior first degree murder, for which he was tried as an adult, provided a principled, rational way in

which to differentiate this case from other cases and was properly weighed by the jury in analyzing the evidence of aggravating and mitigating circumstances and in determining the appropriate punishment." *Davis*, 141 S.W.2d at 617-18. In addition, during its proportionality review, the supreme court acknowledged that the prior violent felony aggravating circumstance is "more qualitatively persuasive and objectively reliable" than others. *Id.* at 621. The underlying facts surrounding that murder were not revealed to the jury. As the Petitioner argues, however, "[t]he fact that it was proved by a clerk with a piece of paper does not purge the smell of blood from the courtroom - nor from the jury's minds." Similarly, we are not convinced, having reviewed the mitigating evidence presented, that the jury's consideration of an invalid prior first degree murder conviction was not an overriding influence on the sentence imposed.

Finally, the prosecutor referenced the Petitioner's prior convictions more than several times throughout closing argument. While attempting to downplay the mitigating proof presented by the Petitioner, the prosecutor emphasized to the jury throughout the argument that the Petitioner had already killed three people and attempted to kill another. We are not persuaded by the State's argument that the petitioner's prior valid conviction for attempted second degree murder rendered the jury's consideration of the invalid first degree murder conviction harmless. Instead, removing from the jury's consideration the overwhelmingly stronger of the two prior violent felony convictions rendered that aggravating circumstance less qualitatively persuasive and objectively reliable. As our colleagues commented in Berry's post-conviction appeal: "Given that the State repeatedly asked the jury to sentence the petitioner to death for the taking of three lives rather than the two for which he was on trial, we cannot say that the error in the admission of his prior conviction of first degree murder was harmless beyond a reasonable doubt." *Berry*, at 366 S.W.3d at 185.

## Conclusion

Accordingly, the judgment of the trial court denying a new trial but granting a new capital sentencing hearing is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE